FILED

2018 Dec-13  PM 03:22
U.S. DISTRICT COURT
N.D. OF ALABAMA



# IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ALABAMA
### SOUTHERN DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA<br>ex rel. HAL LIVINGSTON | ) | |
| | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Civil Action No.:_____ |
| | ) | |
| DIGIRAD CORPORATION | ) | FILED UNDER SEAL |
| | ) | |
| Defendant. | ) | DO NOT PUT IN PRESS BOX |
| | ) | DO NOT PUT ON PACER |
| | ) | |
| | ) | JURY REQUESTED |
| | ) | |

# Table of Contents

INTRODUCTION ........................................................................................................................ 3

JURISDICTION AND VENUE .................................................................................................... 5

PARTIES .................................................................................................................................... 6

APPLICABLE LAW .................................................................................................................... 7

   A.    The False Claims Act ........................................................................................... 7

   B.    The Anti-Kickback Statute .................................................................................. 8

   C.    The Department of Health and Human Services Has Scrutinized and Sought to Prevent Over-Utilization of Advanced Diagnostic Imaging Services ..................................................... 10

   D.    Medicare Improvements for Patients and Providers Act (MIPPA) .......................... 11

        •   CMS Guidance Interpreting the MIPPA Advanced Diagnostic Imaging Accreditation Requirements ................................................................................................... 13

   E.    Items and Services Specifically Excluded from Medicare Coverage and Governing Local Coverage Determinations ................................................................................................... 15

        •   Palmetto GBA Cardiac Radionuclide Imaging LCD 33457 ............................... 16

   F.    Accrediting Organizations and Standards ........................................................... 18

        •   IAC Facility Accreditation Standards ............................................................ 18

        •   IAC Requirements for Medical Directors ....................................................... 20

        •   IAC Standard for Medical Staff .................................................................... 22

        •   IAC Standard for Technical Staff ................................................................. 22

        •   IAC Standard for Direct Patient Care Personnel ........................................... 23

   G.    State Law Governing the Ordering, Possession and Administration of Radioactive Materials . 24

NUCLEAR STRESS TEST BACKGROUND .............................................................................. 25

DEFENDANT'S FRAUDULENT SCHEMES ............................................................................. 30

   A.    Digirad Causes False Claims to be Submitted to Medicare by Making False Representations and Encouraging Physicians to Submit False Claims. .................................................. 30

   B.    Digirad's Contracts and Contracted Physician Billing Practices are Contrary to IAC Standards and in Violation of Medicare Conditions of Payment. ................................................ 33

   C.    Digirad's Pricing Model and Offer and Provision of Illegal Remuneration Violates  the Anti-Kickback Statute. ................................................................................................... 39

   D.    Specific Representative Examples of False Claims Paid Based on Digirad's Fraudulent Representations ................................................................................................... 42

COUNT ONE ............................................................................................................................. 44

COUNT TWO ............................................................................................................................. 45

COUNT THREE .......................................................................................................................... 46

## *QUI TAM COMPLAINT*

Relator Hal Livingston, on behalf of himself and the United States of America, alleges and claims against Digirad Corporation, as follows:

## **INTRODUCTION**

1.      This *qui tam* Complaint alleges that Digirad Corporation ("Digirad") causes false claims for advanced diagnostic imaging services to be submitted to government healthcare programs.   Digirad does so, in part, by making false statements to government-designated accrediting agencies to gain false accreditation status for physicians.  Based on fraudulently gained accreditation status, Digirad encourages these physicians (hereinafter "Contracted Physicians") to bill for advanced diagnostic imaging services although doing so is in violation of Medicare conditions of payment because the Contracted Physicians do not have the requisite training and experience to gain accreditation and supervise such services and thus are not eligible to legally bill for these services.  Moreover, the Contracted Physicians are, at most, performing a minor portion of the advanced diagnostic services billed; yet, based on Digirad's instruction and assurances, the Contracted Physicians bill federally-funded healthcare programs as though they performed the entirety of complex, advanced diagnostic imaging services.

2.      Digirad operates by soliciting physicians—most often primary care physicians without any knowledge or training in nuclear medicine or advanced diagnostic imaging—to "lease" its turn-key, mobile diagnostic services in exchange for set, per-patient payments.  Digirad proposes that Contracted Physicians are not required to perform any meaningful work related to the testing but falsely represents that by retaining Digirad's services, each Contracted Physician will be able to legally bill government health care programs under his or her individual National

Provider Identifier (NPI) for specialized advanced diagnostic services, as though the Contracted Physician performed the advanced diagnostic service when they did not. Digirad's sales pitch to doctors is "all you have to do is be under the same roof." Essentially, Digirad falsely represents that a physician need not have any qualifications but must only do two things to receive the higher reimbursement rates of an accredited physician: (1) refer patients for advanced diagnostic tests and (2) pay Digirad a fee for performing all the meaningful work. Thereafter, Digirad explains that the physician can bill the patients' insurance company, including government health care programs. For doing so, the physician collects the margin between the federal, taxpayer-funded payment and Digirad's fee as a windfall profit.

3.      Digirad furthermore offers its Contracted Physicians discounts based on the number of patients it can test on any given day. These volume-driven discounts result in a greater windfall profit for the physician. By doing so, Digirad offers and provides illegal remuneration based on the number of patients referred for diagnostic imaging in violation of 42 U.S.C. § 1320a-7b(b) (the "Anti-Kickback Statute").

4.      Digirad represents that this scheme can be implemented for a variety of advanced diagnostic procedures. This Complaint, however, focuses on a specific service: Myocardial Perfusion Imaging, commonly referred to as a cardiac nuclear stress study. A nuclear stress study (including associated procedures, interpretations and radioactive pharmaceuticals utilized for this study – all of which Digirad represents the Contracted Physicians may bill as though they personally provided) is among the highest cost procedures that can be performed in a primary care physician's outpatient office. Such nuclear stress studies involve injecting radioactive dye into the patient's bloodstream and taking two sets of images of the patient's heart, one while the patient is at rest and one while the patient is put under stress such as when the patient's heart rate is pushed

to the limit as the patient is instructed to perform cardiac exercise on a treadmill or stationary bicycle.

5.      As detailed herein, Digirad causes the submission of false claims for advanced diagnostic imaging services, specifically cardiac nuclear stress studies, in violation of 31 U.S.C. 3729 *et seq.* (the "False Claims Act" or "FCA"), by: (a) making false representations about the responsibility and supervision of its employees to gain requisite accreditation; (b) falsely instructing Contracted Physicians that they may legally bill for advanced diagnostic imaging services; and (c) providing illegal remuneration in the form of volume based discounts without adhering to requirements to exempt such discounts from prosecution pursuant to the Anti-Kickback Statute.

## JURISDICTION AND VENUE

6.      This action arises under the federal False Claims Act.  Accordingly, this Court has jurisdiction pursuant to 28 U.S.C. §1331.  Jurisdiction is also authorized under 31 U.S.C. § 3732(a).

7.      Venue lies in this judicial district pursuant to 31 U.S.C. § 3732(a) because Defendant qualifies to do business in the State of Alabama, transacts business in the State of Alabama, transacts business in this judicial district and can be found here.  Furthermore, Defendant committed within this judicial district acts proscribed by 31 U.S.C. §3729, to wit: Defendant caused to be submitted to the United States false claims for payment for advanced diagnostic services including nuclear medicine testing which were billed to government health care programs by physicians without valid nuclear medicine accreditation in violation of 42 U.S.C. § 1395m and without appropriate supervision in violation of 42 U.S.C. § 1395y.  Further, Defendant provides

illegal remuneration in the form of volume referral based discounts to customers without providing adequate notice of the buyer's obligation to report such discounts and to provide information upon request of the Department of Health and Human Services, in violation of 42 U.S.C. § 1320a-7b(b).

## PARTIES

8.    Defendant Digirad Corporation (Digirad) is a publicly traded corporation that provides diagnostic imaging services, including mobile diagnostic imaging, solid-state nuclear imaging and cardiac monitoring.  Digirad is headquartered in Suwanee, Georgia and operates throughout the United States.

9.    Relator Hal Livingston is the founder of Lister Healthcare, a health care solutions company that provides a variety of services to physicians.  The services provided by Relator Livingston's company include office management, electronic medical records management, Chronic Care Management, Annual Wellness Visits, regulatory compliance, clinical laboratory services, CT, MRI and Nuclear Medicine services.  In this role, Relator Livingston was solicited by Digirad to retain its services for the primary care physician offices Lister Healthcare manages. Through this experience and through in-depth due diligence related to Digirad's solicitation, including interactions and communications with Digirad and its regional and national management, Relator Livingston has detailed, personal knowledge of Digirad's business model, the false representations made by Digirad, and the misleading and fraudulent contracts utilized by Digirad. Prompted by Relator Livingston's dedication to compliance with Medicare billing requirements and the recognizable impropriety of Digirad's proposed arrangement, Relator Livingston questioned the legality of Digirad's proposed arrangement in correspondence with Digirad sales staff and management. In doing so, Relator Livingston accurately identified obvious problematic issues with Digirad's proposal: if Digirad did all the work, how could a primary care

physician legally bill for this procedure under the physician's NPI number?  Moreover, how could

a primary care physician bill for nuclear stress studies and associated procedure codes, when the

primary care physician had no knowledge or training related to the procedure – which is the basis

of the accreditation requirement for advanced diagnostic testing?  When Relator Livingston posed

these questions to Digirad management, he found the answers provided by Digirad to be false,

misleading, and indicative of fraud.

10.     Prior to filing this Complaint, Relator Livingston voluntarily disclosed to the

United States the information upon which this action is based.  Relator is unaware of any prior

disclosure of any information materially pertaining to the fraud alleged in this Complaint. To the

extent that any public disclosure has taken place as defined by 31 U.S.C. §3729(e)(4)(A), Relator

is the original source of the information for purposes of that Section. Relator has knowledge that

is independent of and materially adds to any purported publicly disclosed allegations or

transactions and has voluntarily provided that information to the United States before filing this

Complaint as contemplated by 31 U.S.C. §3729(e)(4)(B)(2).  Relator serves the United States

contemporaneously herewith a statement of the material evidence in his possession upon which

his claims are based.

## APPLICABLE LAW

### A. The False Claims Act

11.     The False Claims Act provides, *inter alia*: any person who (1) "knowingly presents,

or causes to be presented, a false or fraudulent claim for payment or approval,"; (2) "knowingly

makes, uses, or causes to be made or used, a false record or statement material to a false or

fraudulent claim,"; (3)"knowingly makes, uses, or causes to be made or used, a false record or

statement material to an obligation to pay or transmit money or property to the Government, or

knowingly conceals or knowingly and improperly avoids or decreases an obligation to pay or transmit money or property to the Government" or (4) conspires to commit a violation of the False Claims Act is liable to the United States for a civil monetary penalty of not less than $5,500 and not more than $11,000, as adjusted by the Federal Civil Penalties Inflation Adjustment Act of 1990 (28 U.S.C. 2461 note; Public Law 104–410 [1]), plus treble damages. 31 U.S.C. § 3729(a)(1)(A), (B), (C), (G).

12.     Under the FCA, (1) the terms "knowing" and "knowingly"— (A) mean that a person, with respect to information— (i) has actual knowledge of the information; (ii) acts in deliberate ignorance of the truth or falsity of the information; or (iii) acts in reckless disregard of the truth or falsity of the information; and (B) require no proof of specific intent to defraud.

13.     The FCA also defines the term "claim*" as* — (A) any request or demand, whether under a contract or otherwise, for money or property and whether or not the United States has title to the money or property, that— (i) is presented to an officer, employee, or agent of the United States; or (ii) is made to a contractor, grantee, or other recipient, if the money or property is to be spent or used on the Government's behalf or to advance a Government program or interest, and if the United States Government— (I) provides or has provided any portion of the money or property requested or demanded; or (II) will reimburse such contractor, grantee, or other recipient for any portion of the money or property which is requested or demanded; []. 31 U.S.C. § 3729(b)(1)-(2).

**B. The Anti-Kickback Statute**

14.     The Anti-Kickback Statute gives rise to additional causes of action under the False Claims Act as follows: (1) Whoever knowingly and willfully solicits or receives any remuneration (including any kickback, bribe, or rebate) directly or indirectly, overtly or covertly, in cash or in kind—(A) in return for referring an individual to a person for the furnishing or arranging for the

furnishing of any item or service for which payment may be made in whole or in part under a Federal health care program, or (B) in return for purchasing, leasing, ordering, or arranging for or recommending purchasing, leasing, or ordering any good, facility, service, or item for which payment may be made in whole or in part under a Federal health care program, shall be guilty of a felony and upon conviction thereof, shall be fined not more than $25,000 or imprisoned for not more than five years, or both; (2) Whoever knowingly and willfully offers or pays any remuneration (including any kickback, bribe, or rebate) directly or indirectly, overtly or covertly, in cash or in kind to any person to induce such person— (A) to refer an individual to a person for the furnishing or arranging for the furnishing of any item or service for which payment may be made in whole or in part under a Federal health care program, or (B) to purchase, lease, order, or arrange for or recommend purchasing, leasing, or ordering any good, facility, service, or item for which payment may be made in whole or in part under a Federal health care program, shall be guilty of a felony and upon conviction thereof, shall be fined not more than $25,000 or imprisoned for not more than five years, or both. 42 U.S.C. § 1320a-7b(b).

15.     Actual knowledge or specific intent not required—With respect to violations of the Anti-Kickback Statute, a person need not have actual knowledge of the statutory provisions or specific intent to commit a violation. 42 U.S.C. § 1320a-7b(h).

16.     There are certain narrowly defined payment practices, commonly referred to as "safe harbors," that are excluded from the Anti-Kickback Statute's criminal penalties and civil liability pursuant to the False Claims Act. 42 U.S.C. § 1320a-7b(3). One such safe harbor, relates to payment practices related to "a discount or other reduction in price obtained by a provider of services or other entity under a Federal health care program if the reduction in price is properly

disclosed and appropriately reflected in the costs claimed or charges made by the provider or entity under a Federal health care program." *Id.*

17.     To qualify for this exception, a "seller [that] is an individual or entity that supplies an item or service for which payment may be made, in whole or in part, under Medicare, Medicaid or other Federal health care programs to the buyer and who permits a discount to be taken off the buyer's purchase price" must comply with the following standard: "fully and accurately report such discount on the invoice, coupon or statement submitted to the buyer; *inform the buyer in a manner reasonably calculated to give notice to the buyer of its obligations to report such discount* and to provide information [regarding the discount] upon request to the Department of Health and Human Services or a State agency."  42 C.F.R. 1001.95(h)(2)(emphasis added).

### C.   The Department of Health and Human Services Has Scrutinized and Sought to Prevent Over-Utilization of Advanced Diagnostic Imaging Services

18.     In 2006, the Department of Health and Human Services Office of Inspector General (OIG) conducted a review of advanced imaging utilization in ambulatory settings, which includes physician's offices and independent diagnostic testing facilities (IDTF).[1]  The study was conducted because advanced diagnostic imaging has proliferated in ambulatory settings whereas advanced imaging was previously in the exclusive domain of hospitals.

19.     The OIG review relied on Medicare Part B claims and enrollment data from 1995 to 2005 and found substantial noncompliance with Medicare standards.  This non-compliance coincided with an explosion of outpatient advanced imaging utilization and payments under the Medicare Physician Fee Schedule – growing from 1.4 million services in 1995 to 6.2 million

---

[1] Department of Health and Human Services, Office of Inspector General; Growth in Advanced Imaging Paid Under the Medicare Physician Fee Schedule. OEI-01-06-00260 (October 2007). Available at https://oig.hhs.gov/oei/reports/oei-01-06-00260.pdf

services in 2005.[2]   Allowed charges and utilization rate per beneficiary grew by a similar magnitude, to $3.5 billion and 163 services per 1,000 beneficiaries.[3]

20.     "The growth in advanced imaging paid under the MPFS raises questions and challenges for the Medicare program, particularly regarding the quality and appropriateness of services.  Ongoing OIG work is focusing on different aspects of this growth, including a more specific examination of how advanced imaging services are provided in ambulatory settings."[4]

21.     Based on its review, the OIG recommended that CMS monitor the growth of advanced imaging performed in ambulatory settings and reissue technical direction to Medicare carriers regarding oversight of the new IDTF performance standards.  In response, CMS concurred that annual spending for imaging procedures was growing at a rate significantly higher than annual spending for the Medicare program overall and that CMS shared OIG's concern about such growth trends. CMS noted that Congress and CMS itself were already taking steps to limit spending, ensure compliance and clarify performance standards for Medicare payment of advanced imaging procedures.[5]

**D.  Medicare Improvements for Patients and Providers Act (MIPPA)**

22.     As suggested by the OIG Report, Congress soon thereafter took steps to regulate advanced diagnostic imaging in ambulatory settings and rein in Medicare spending for these services in part by imposing mandatory accreditation requirements for advanced imaging facilities as a prerequisite to receive payment from Medicare for advanced diagnostic imaging services. Section 135(a) of the Medicare Improvements for Patients and Providers Act of 2008 (MIPPA)

---

[2] *Id.*
[3] *Id.*

[4] *Id.*

[5] *Id.*

(P.L. 110-275) amended section 1834(e) of the Social Security Act. This amendment requires suppliers of the technical component of advanced diagnostic imaging (ADI) services to be accredited by a designated accrediting organization in order to receive Medicare reimbursement. *See* 42 U.S.C. § 1395m; *See also* 42 U.S.C. § 1395y ("no payment may be made under part A or part B of this subchapter for any expenses incurred for items or services – which are the technical component of advanced diagnostic imaging services described in section 1395m(e)(1)(B) of this title for which payment is made under the fee schedule established under section 1395w-4(b) of this title and that are furnished by a supplier (as defined in section 1395x(d) of this title), if such supplier is not accredited by an accreditation organization designated by the Secretary.") This accreditation requirement for ADI suppliers became effective January 1, 2012. *See Id.*

23.     "Advanced diagnostic imaging service means any of the following diagnostic services: (i) Magnetic resonance imaging. (ii) Computed tomography; (iii) Nuclear medicine; (iv) Positron emission tomography." 42 U.S.C. 1395m(e)(1)(B); 42 CFR 414.68(b).

24.     Therefore, in order to bill Medicare for the technical component of these advanced diagnostic imaging services, the supplier must be accredited by a designated accreditation organization. 42 U.S.C. § 1395m; 42 U.S.C. § 1395y.

25.     "The term 'supplier' means, unless the context otherwise requires, a physician or other practitioner, a facility, or other entity…that furnishes items or services under this subchapter." 42 U.S.C. §1395x(d).

26.     Pursuant to Section 1834(e) of Social Security Act, the Secretary of the Department of Health and Human Services has designated and approved independent accreditation organizations for purposes of accrediting suppliers furnishing the technical component (TC) of advanced diagnostic imaging services and established procedures to ensure that the criteria used

by an accreditation organization is specific to each imaging modality.  42 CFR 414.68(a)

27.    There are statutory standards requiring accrediting bodies to meet certain requirements for medical directors or supervising physicians including whether a medical director or supervising physician (A) in a particular specialty receives training in advanced diagnostic imaging services in a residency program; (B) has attained, through experience, the necessary expertise to be a medical director or a supervising physician; (C) has completed any continuing medical education courses relating to such services; or (D) has met such other standards as the Secretary determines appropriate. 42 U.S.C. § 1395m(e)(4).

- **CMS Guidance Interpreting the MIPPA Advanced Diagnostic Imaging Accreditation Requirements**

28.    When MIPPA, its implementing regulations, and specifically the accreditation requirements for advanced diagnostic imaging, were instituted, CMS held an informative conference call and provided a PowerPoint presentation providing guidance, entitled "Accreditation Requirement for the Advanced Diagnostic Imaging Technical Component."[6]  This conference call and Question and Answer session was "directed towards physicians, non-physician practitioners, Independent Diagnostic Testing Facilities, and any Medicare provider or supplier that furnishes the technical component of advanced diagnostic imaging services."[7]

29.    As evidenced by this guidance, CMS holds a clear position that the entity, facility or physician, as identified by the National Provider Identifier, that is billing Medicare for advanced diagnostic imaging services must be accredited.   The interpretive guidance provides: "The

---

[6] Centers for Medicare & Medicaid Services Accreditation Requirements for the Advanced Diagnostic Imaging Technical Component Suppliers Conference Call Moderator: Elan Schnitzer June 23, 2011. Available at: https://www.cms.gov/Medicare/Provider-Enrollment-and-Certification/MedicareProviderSupEnroll/downloads/TranscriptFrom2011-06-23ADIAccredCall.pdf

[7] *Id.* at 2.

accreditation requirement is attached to the facility, the supplier, the lab. ***Whomever is billing Medicare, that is who has to get accredited***....If you're asking for reimbursement from Medicare, you have to comply with Medicare requirements, and accreditation is one of them. ***So, please, again, that's nice that you're using a mobile accreditation facility, but if you yourself are not accredited, it won't matter. Your claims will still be denied.***"[8]

30.     Throughout the guidance provided, CMS reiterates that the entity, physician, supplier; "whoever is billing Medicare" must be accredited. Additional examples include: "[T]he requirements are for any type of office, physician or otherwise, IDTF (Independent Diagnostic Testing Facility) or otherwise. You need to meet the requirements for accreditation if you're billing Medicare for any advanced diagnostic images."[9]

31.     CMS elaborates: "In regard to 'mobile units,' whatever the scenario is, whatever the case may be, leasing time…a mobile unit comes by, and they're accredited and they go from city to city, and facility to facility, physician office to physician office, and they're accredited. If they're doing the billing, then that's fine. **But if you're doing the billing, you have to be responsible for meeting all Medicare requirements.**"[10] (emphasis added)

32.     Additionally, to continue to ensure advanced diagnostic imaging services are being utilized appropriately, the Protecting Access to Medicare Act (PAMA) of 2014, Section 218(b), established a new program to increase the rate of appropriate advanced diagnostic imaging services provided to Medicare beneficiaries.[11]   Under this program, at the time a practitioner orders an advanced imaging service for a Medicare beneficiary, he or she will be required to consult a

---

[8] *Id.* at 9 (emphasis added).
[9] *Id.* at 11.
[10] *Id.* at 14.
[11] Appropriate Use Criteria for Advanced Diagnostic Imaging – Voluntary Participation and Reporting Period - Claims Processing Requirements – HCPCS Modifier QQ; Medicare Learning Network, available at: https://www.cms.gov/Outreach-and-Education/Medicare-Learning-Network-MLN/MLNMattersArticles/Downloads/MM10481.pdf

qualified Clinical Decision Support Mechanism (CDSM). CDSMs are the electronic portals through which practitioners access appropriate use criteria (AUC) during the patient workup. Although these PAMA regulations are not mandatory until 2020, the statutory intent represents efforts to rein in Medicare spending for advanced diagnostic services. Digirad's model thwarts such an intent, ignores and contravenes the clear and unambiguous guidance from CMS, and violates MIPAA's express accreditation requirements and their manifest purpose.

### E. Items and Services Specifically Excluded from Medicare Coverage and Governing Local Coverage Determinations

33.     It is a universal requirement of the Medicare program that all items and services provided to Medicare beneficiaries must be reasonable and medically necessary. *See* 42 U.S.C. §1395y(a)(1)(A). Medical necessity of a service is the overarching criterion for payment in addition to the individual requirements of a CPT code. MEDICARE CLAIMS PROCESSING MANUAL at § 30.6.1

34.     Federal law authorizes Medicare administrative contractors ("MACs") and fiscal intermediaries ("FIs") to issue determinations as to the extent of Medicare coverage for particular items or services. *See* 42 U.S.C. 1395ff. Accordingly, Medicare MACs and FIs publish local coverage determinations ("LCDs"), establishing requirements for and limitations of coverage of specific services. *See* 42 U.S.C. 1395ff(f)(2)(B). Medicare will not pay for services that do not comply with the requirements set forth in LCDs. *See Id.;* 42 U.S.C. 1395y.

35.     Providers submit claims for payment to Medicare and for services based on the Physician Fee Schedule using CMS Form 1500. Each time one of Digirad's Contracted Physicians submitted CMS Form 1500, it certified that the claim was true, accurate, and complete. Further, on each submission of Form 1500, Digirad's Contracted Physicians certified that the services for which payment was requested were medically indicated and necessary for the health of the patient.

36.    CMS Form 1500 also provides notice that "[a]ny person who knowingly files a statement of claim containing misrepresentation or any false, incomplete or misleading information be guilty of a criminal act punishable under law and may be subject to civil penalties." *See* CMS Form 1500.

- **Palmetto GBA Cardiac Radionuclide Imaging LCD 33457**

37.    Palmetto GBA is the MAC approved for a region of the southeast United States, where Digirad has a significant percentage of its nationwide operations, including Alabama. Palmetto GBA has issued LCD 33457, which governs Medicare payment for Cardiac Radionuclide Imaging, including Myocardial Perfusion Imaging (nuclear stress studies) under CPT codes 78451-78454 ("Palmetto Cardiac Radionuclide Imaging LCD").[12]

38.    The Palmetto Cardiac Radionuclide Imaging LCD sets forth several sets of requirements that must be met in order for Medicare to reimburse providers for Myocardial Perfusion Imaging services.  These conditions of payment include several medical necessity requirements that demonstrate the clinical decision-making that must be exercised in ordering such a test, which could be influenced by volume quotas and volume incentives. The confines of an appropriate Myocardial Perfusion Imaging Service state that "Patients with a high pretest probability of disease are usually not candidates for this study unless determination of the size and reversibility of a defect are required for clinical decision making.  Patients whose diagnosis is in question benefit most from this study.  Patients with a low pretest probability of disease are usually not studied except when a prior exercise stress test by treadmill electrocardiogram (ECG) or echo

---

[12] Palmetto GBA; LCD 33457, Cardiac Radionuclide Imaging; *available at*: https://www.cms.gov/medicare-coverage-database/details/lcd-details.aspx?LCDId=33457&ContrId=375&ver=36&ContrVer=1&CntrctrSelected=375*1&Cntrctr=375&s=All&DocType=Active%7cFuture&bc=AAgAAAQAAAAA&

is a presumed false positive. Stress myocardial perfusion imaging, preceded by satisfactory stress echocardiography (CPT code 93350), is not medically necessary."[13]

39.     The Palmetto Cardiac Radionuclide Imaging LCD also imposes requirements related to physician supervision of myocardial perfusion procedures and associated cardiology stress procedures (billed under CPT codes 93015-93018) – which are the precise services most at issue in this Complaint. Specifically, myocardial perfusion procedures (such as CPT code 78452) require general supervision by a qualified physician licensed to administer radioactive materials.[14] Cardiology stress procedures (CPT codes 93015-93018) performed in conjunction with nuclear myocardial perfusion imaging studies are covered by Medicare only when performed under the direct supervision of a qualified physician, who provides:

- Medical expertise required for performance of the test
- Medical treatment for complication and side effects of the test
- Medical services required as part of the test such as injection of medications
- Medical expertise in the interpretation of the cardiovascular stress test component, some of which has to be provided during the test and before the patient is discharged from the testing suite.

*See Palmetto Cardiac Radionuclide Imaging LCD.*

40.     As detailed herein, Digirad's Contracted Physicians who bill for myocardial perfusion procedures do not provide general supervision as required by the LCD, are not licensed to administer radioactive materials, and are therefore are not qualified to perform or bill for myocardial perfusion procedures. Further, the Contracted Physicians billing for cardiology stress procedures performed in conjunction with myocardial perfusion imaging studies:

- do not provide, or have medical expertise required for performance of the test;
- do not provide medical treatment for complication and side effects of the test;
- do not provide medical services required as part of the test such as the injection of medications; and

---

[13] *Id.*
[14] *Id.*

- do not provide medical expertise in the interpretation of the cardiovascular stress test component.

Instead, Digirad physicians and medical staff perform all of the required supervision and procedures and falsely inform the Contracted Physicians that the Contracted Physicians may bill federal healthcare programs for these procedures – in direct violation of the Palmetto Cardiac Radionuclide Imaging LCD.

### F.  Accrediting Organizations and Standards

41.     As of this writing, CMS has designated four ADI accrediting organizations: (a) the American College of Radiology; (b) Intersocietal Accreditation Commission; (c) RadSite; and (d) The Joint Commission.

42.     Defendant Digirad Corporation has informed Relator that it prefers to use the Intersocietal Accreditation Commission (IAC) as its accrediting organization.   As set out more fully below, Digirad's practices and contracts contravene both IAC and CMS standards.

- **IAC Facility Accreditation Standards**

43.     As required by Congress, the ADI accrediting organizations must provide assurance to CMS that the medical professionals rendering and billing for nuclear medicine services are adequately trained and experienced in this specialty.

44.     "The Intersocietal Accreditation Commission (IAC) *accredits imaging facilities* specific to nuclear cardiology, general nuclear medicine and positron emission tomography (PET)."[15]

45.     Importantly, the IAC (as well as other CMS accrediting organizations) accredit the "facility" itself.   The IAC defines a nuclear cardiology, general nuclear medicine and/or PET

---

[15] The IAC Standards and Guidelines for Nuclear/PET Accreditation at p. 4; (Sept. 15, 2016) (emphasis added) available at: https://www.intersocietal.org/nuclear/standards/iacnuclearpetstandards2016.pdf).

facility as: "consist[ing] of at least one nuclear imaging camera, a qualified physician and a nuclear medicine technologist."[16]

46.     Moreover, the IAC (as well as other CMS accrediting organizations) do not simply accredit the individuals providing the technical component of the nuclear stress test but as detailed below, have specific requirements for the technical, interpretative, and supervisory portion of nuclear stress tests in order to gain IAC accreditation.  Therefore, for a "facility" to be accredited to perform the technical component of nuclear stress tests, as required by MIPPA, the facility must demonstrate compliance with all IAC accreditation standards.

47.     The IAC accreditation standards, as established by the accrediting organizations with mandatory direction from Congress, are related to both the training and experience of the medical professionals rendering and billing for the nuclear medicine services and the level of responsibility, supervision and control those trained and experienced medical professionals have over the provision of nuclear medicine services.

48.     Each IAC accredited facility must have a designated, specifically credentialed, physician who serves as "Medical Director" and a designated, specifically credentialed nuclear technologist who serves as a "Technical Director."  An IAC accredited facility "may be a single site, a conglomerate of sites, a facility utilizing the services of a mobile company or a combination of the above, meeting the organizational structures defined in [the IAC Standards and Guidelines for Nuclear/PET Accreditation].  There may be additional physicians, nuclear medicine technologists and other professional and/or technical personnel.  When more than one technical member is employed, a Technical Director (e.g., chief technologist) is responsible for supervision

---

[16] The IAC Standards and Guidelines for Nuclear/PET Accreditation at p. 4; (Sept. 15, 2016); available at: https://www.intersocietal.org/nuclear/standards/iacnuclearpetstandards2016.pdf

of the technical staff."[17]

49.     "The [IAC] accreditation Standards and Guidelines are the minimum standards for accreditation of Nuclear/PET facilities. Standards are the minimum requirements to which an accredited facility is held accountable."[18]

50.     "In addition to all [IAC] Standards the facility, including all staff, must comply at all times with all federal, state and local laws and regulations, including but not limited to laws relating to licensed scope of practice, facility operations and billing requirements."[19]

- **IAC Requirements for Medical Directors**

51.     In addition to numerous other requirements, Section 1A of the IAC standards provides the "Training and Experience" requirements for "Medical Directors" and requires an IAC accredited facility to have at least one qualification pertaining to being Board certified in cardiology or Board certified in diagnostic radiology or if training before 1995, a requisite amount of experience including interpreting at least 800 nuclear cardiology, nuclear medicine and/or PET studies within the past 10 years and 200 cases of which must have been in the past two years.[20]

52.     As set out more fully below, the physicians that Digirad solicits and induces to sign its contracts do not have the requisite training or experience to serve as Medical Directors for IAC accredited facilities.  Instead, Digirad Medical Directors are remote, off-site Digirad employees, who, as represented by Digirad are "responsible for reviewing our nuclear medicine procedures"

53.     In actuality, the IAC requires Medical Directors to exert a significant amount of responsibility over the accredited facility including being "responsible for all nuclear medicine

---

[17] The IAC Standards and Guidelines for Nuclear/PET Accreditation at p. 4; (Sept. 15, 2016); available at: https://www.intersocietal.org/nuclear/standards/iacnuclearpetstandards2016.pdf
[18] *Id. at* 4.
[19] *Id.*
[20] See The IAC Standards and Guidelines for Nuclear/PET Accreditation at p. 5-6; Section 1A. (Sept. 15, 2016); available at: https://www.intersocietal.org/nuclear/standards/iacnuclearpetstandards2016.pdf

services provided including quality control, radiation safety, quality of care and appropriateness of care."[21]   These responsibilities include but are not limited to assuring compliance with all policies/procedures/protocol and active oversight of radiation safety within the facility. Additionally, the Medical Director must be a member of the facility and provide final interpretation/report of some nuclear medicine procedures for the facility.

- **IAC Standard for Technical Director**

54.     Technical Directors for IAC accredited facilities must possess appropriate credentials in nuclear medicine technology.   The physicians that Digirad solicits and induces to sign its contracts do not have the requisite training or experience to serve as Technical Directors for IAC accredited facilities.   Digirad Technical Directors are actually remote offsite Digirad employees even though the Contracted Physicians are induced to bill for their services under their own billing codes.

55.     The Technical Director of IAC accredited facilities have mandatory responsibilities, which include, but are not limited to: "the day-to-day operations of the facility."[22] The IAC also provides the Technical Director should generally be a full-time position.   If the Technical Director is not on-site full-time, he or she must work a minimum of at least 20% of normal hours each month in the facility AND an appropriately credentialed technologist must be appointed in the Technical Director's absence during normal business hours and report to the Technical Director.   Digirad's model, however, provides for the Technical Director – a Digirad employee with no "day-to-day operations of the facility"—to work remotely away from the facility of the Contracted Physicians who bill for the services.

---

[21] See The IAC Standards and Guidelines for Nuclear/PET Accreditation at p. 6; Section 1A. (Sept. 15, 2016); available at: https://www.intersocietal.org/nuclear/standards/iacnuclearpetstandards2016.pdf.

[22] *Id.* at 7.

- **IAC Standard for Medical Staff**

56.     "Medical Staff" are the physicians that interpret the nuclear stress study images and compile the nuclear stress test reports.

57.     For a facility to gain IAC accreditation, "all members of the medical staff must be licensed physicians.  Any physician authorizing administration of radiopharmaceuticals must be an authorized user of radioisotopes according to NRC or state regulatory agency regulations."[23]

58.     Medical Staff of IAC accredited facilities must meet one of several specific criteria which generally require the member of the medical staff to be experienced in cardiology, nuclear cardiology and/or diagnostic radiology and includes: "Board Certification in cardiology and a four-month formal training program in nuclear cardiology."[24]

59.     The Medical Staff responsibilities require, among other things, that the "interpreting medical staff must provide the final interpretation/report of the nuclear medicine procedures."[25]

60.     As set out more fully below, the physicians that Digirad solicits and induces to sign its contracts do not have the requisite training or experience to serve as Medical Staff for IAC accredited facilities, nor do the Contracted Physicians perform the work required of Medical Staff under IAC guidelines.   When questioned about its medical staff's credentialing related to accreditation, Digirad summarily represented to Relator: "Our reading physicians are with UAB [the University of Alabama at Birmingham] and we make sure they meet one of the requirements."

- **IAC Standard for Technical Staff**

61.     "Technical Staff" are the only Digirad employees that actually visit the Contracted

---

[23] *Id.* at 8.
[24] *Id.*
[25] *Id*

Physician's office and administer the nuclear stress tests, monitor the patient at rest and at exertion, and capture the nuclear images.

62.     Pursuant to the IAC Standards, technical staff must be nuclear technologists who have an appropriate credential in nuclear medicine technology (i.e., Certified Nuclear Medicine Technologist (CNMT, NCT or PET) or Registered Technologist (Nuclear) RT(N) credentialed in the U.S. and/or state and licensed to practice as a nuclear medicine technologist) and hold Current Basic Life Support (BLS) certification.[26]

63.     IAC Standards require the technical staff to report to the Technical Director.  The technical staff are responsible for image acquisition and the performance of procedures and other duties, as assigned.[27]

64.     As set out more fully below, the physicians that Digirad solicits and induces to sign its contracts do not have the requisite training or experience to serve as Technical Staff for IAC accredited facilities, nor do the Contracted Physicians perform the work required of Technical Staff under IAC guidelines, nor do the Contracted Physicians have on their staff Certified Nuclear Medicine Technologists or other staff who have appropriate credentials in nuclear medicine technology.

- **IAC Standard for Direct Patient Care Personnel**

65.     IAC also provides a set of standards for "Direct Patient Care Personnel," including the mandate that "[a]ll personnel directly supervising stress procedures must have appropriate training/experience.  While physician presence during stress testing is not required, the facility must assure that appropriate staff is present based upon the types of procedures being performed

---

[26] *Id.* at 10.
[27] *Id.* at 10.

and the patients' risks of adverse events."[28]

66.     Further, the IAC requires Advanced Cardiac Life Support (ACLS) certified personnel on-site and immediately available during cardiac stress procedures.[29]

67.     Related to "Stress Testing Oversight," the IAC requires that "there must be a system in place for the assurance of the proper administration, including timing, of radiopharmaceuticals relative to the performance of stress testing.  If the personnel who conduct stress testing for nuclear imaging procedures are not under the supervision of the Medical Director (e.g., if the stress testing is done by staff in or from another department), there must be a policy in place that assures the proper administration of radiopharmaceuticals (especially timing)."[30]

### G.  State Law Governing the Ordering, Possession and Administration of Radioactive Materials

68.     As the radioactive dye used in cardiac nuclear stress tests has nuclear properties, ordering, possessing and administering the necessary radioactive dye to perform a cardiac nuclear stress test requires nuclear medicine specific credentials.  The "standard protocol" of radioactive dye or radiopharmaceuticals used by Digirad are: Tc-99m Sestamibi, Tl-201 Thallous Chlroride and Tc-99m Tetrofosmin.

69.     "[I]t is unlawful to receive, possess or transfer radioactive drugs, except in accordance with appropriate pharmacy statute(s) and rule(s).  It is also unlawful for any person to provide radiopharmaceutical services unless he/she is a pharmacist or a person acting under the direct supervision of a pharmacy acting in accordance with appropriate pharmacy statute(s) and the State Board of Pharmacy rule(s) and rules of the State Board of Health relating to radiation control.  No person may receive, acquire, possess, use, transfer or dispose of any radioactive

---

[28] *Id.* at 11.
[29] *Id.*
[30] *Id.*

materials except in accordance with the conditions of a radioactive materials license issued by the State Board of Health." § 680-X-2- .20 (1) Alabama State Board of Pharmacy Administrative Code.

70.     Therefore, the medical professionals that possess, use, transfer or dispose of the necessary radioactive materials used in every cardiac nuclear stress test in Alabama must have a radioactive materials license from the Alabama State Board of Health.  The individuals listed and performing the roles of IAC Medical Director, Medical Staff, Technical Director and Technical Staff are also expressly required to have a radioactive materials license by the Alabama State Board of Health or other similar state regulatory agency in the state which they practice.

## NUCLEAR STRESS TEST BACKGROUND

71.     A cardiac nuclear stress test is a specialized medical procedure that uses radioactive dye and a nuclear imaging camera to create images of blood flow to the heart.  The test is conducted by taking measurements and images of blood flow to the heart while the patient is at rest and then measurements and images of blood flow to the heart at exertion.  The purpose of a nuclear stress test is to identify areas with poor blood flow or damage in the heart and is primarily used for the evaluation of coronary artery disease.  Nuclear stress tests may also be prescribed if a routine stress test did not pinpoint the cause of symptoms such as chest pain or shortness of breath or to guide treatment of diagnosed heart disorders.

72.     To perform a nuclear stress test, the medical professionals conducting the test must inject radioactive dye, or radiopharmarmaceuticals, into the patient's veins.  This radioactive dye allows the blood flow to be identified by the nuclear imaging camera.  Initially, a first set of radioactive dyes is injected.  The patient then waits roughly 20 to 40 minutes for the heart cells to

absorb the radioactive dye. At this point, the patient lies on the exam table and the nuclear imaging camera takes the first set of images while the heart is at rest.

73.     The next portion of the test is the "exercise stress test," in which a patient typically walks on treadmill or rides a stationary bike to elevate the patient's heart rate. The difficulty of the exercise generally starts slowly and becomes more strenuous as the test progresses. Patients will continue exercising until a target heart rate is reached or the patient is unable to continue due to moderate to severe chest pain, severe shortness of breath, abnormally high or low blood pressure, and abnormal heart rhythm, dizziness or certain changes in the electrocardiogram.

74.     When the patient's heart rate peaks, the patient will receive a second injection of radioactive dye, and a second set of nuclear images of the heart will be taken. This image will show any areas of the patient's heart receiving inadequate blood flow.

75.     As described above, there are actually several discrete procedures, each of which require distinct responsibilities and credentialing involved in the provision, image procurement, and interpreting of a cardiac nuclear stress test. As such, these discrete procedures are separately billable under Medicare. The actual performance of the "testing" portion of the procedures is referred to as the "cardiology stress procedures" – which are related to the technician and physician services performed in conducting the tests and are broken down into three sub-procedures:

(a)     The "supervision" component of the cardiology stress procedures relates to the physician who is monitoring the patient to ensure that the patient is safe. This procedure must be performed under direct supervision by a *qualified physician.* Direct supervision requires that the physician must be both present in the office suite and immediately available to render assistance,[31] meaning that the physician

---

[31] 42 C.F.R §410.32 (c)(i)

cannot be performing another procedure which cannot be interrupted. The "supervision" procedure of a cardiac stress test is separately billable under CPT code 93016.

(b)     The "tracing" component of the cardiology stress procedures relates to the nuclear technician preparing and injecting the patient with radiopharmaceuticals. This procedure must also be performed under direct supervision by a *qualified physician*. This procedure is separately billable under CPT code 93017.

(c)     The "interpretation and report" of the cardiology stress procedures relates to the physician interpretation of the non-imaging portion of the stress test, which evaluates the patient's EKG tracing and physical condition of the study. This procedure must also be performed under direct supervision by a *qualified physician*. This procedure is separately billable under CPT code 93018

(d)     If the same physician provides the "supervision" and "interpretation and report" procedures – then it may be billed under the "global" CPT code 93015. However – as when billed separately – the global code may only be billed to Medicare when performed under the direct supervision of a *qualified physician*. Pursuant to the governing Palmetto Cardiac Radionuclide Imaging LCD, a qualified physician is one who provides Medical expertise required for performance of the test; Medical treatment for complications and side effects of the test; Medical services required as part of the test such as injections of medications; Medical expertise in the interpretation of the cardiovascular stress test component, some of which has to be provided during the test and before the patient is discharged from the testing suite.[32]

---

[32] Palmetto GBA; LCD 33457, Cardiac Radionuclide Imaging; *available at*: https://www.cms.gov/medicare-coverage-database/details/lcd-

(e)   In addition, the radiopharmaceuticals injected into the patient are billable under separate codes as HCPCS drug codes; the three radiopharmaceuticals used under Digirad's standard protocol are: Tc-99m Sestamibi (billable under code A9500), Tl-201 Thallous Chlroride (billable under code A9505) and Tc-99m Tetrofosmin (billable under code A9502).

76.   The nuclear images captured of the patient's heart with the radioactive dye are then sent to a specially credentialed cardiologist for interpretation, or study, of the images.   The interpreting, or reading, cardiologist also provides a nuclear cardiology report summarizing the results of the test.

77.   A complete nuclear cardiology report includes detailing any identified cardiac perfusion defects as well as the cardiac chamber size, left ventricular wall motion, and right ventricular perfusion and wall motion.[33] Further, stress-induced transient ischemic dilatation, a finding that is indicative of severe and extensive coronary artery disease and a high risk for a hard cardiac event, also should be reported. Additional findings that should be included in the cardiac report are: any abnormal extracardiac uptake, although it may be nonspecific; the type of stress protocol used; the exercise protocol that was used, including the total exercise time, peak exercise heart rate and blood pressure; doubled product of the peak heart rate and the systolic blood pressure used for attenuation correction; metabolic equivalent of task (the ratio obtained by dividing the rate of energy consumption during physical activity by a reference metabolic rate or the rate of energy consumption during rest); relevant changes in the ECG tracing; and chest pain.

---

details.aspx?LCDId=33457&ContrId=375&ver=36&ContrVer=1&CntrctrSelected=375*1&Cntrctr=375&s=All&DocType=Active%7cFuture&bc=AAgAAAQAAAAA&

[33] Ryan A. Dvorak, Richard K. J. Brown, James R. Corbett; Interpretation of SPECT/CT Myocardial Perfusion Images: Common Artifacts and Quality Control Techniques. *Available at*: https://pubs.rsna.org/doi/full/10.1148/rg.317115090

78.     The actual imaging and interpretation of the nuclear images of the cardiac nuclear stress test and report that accompanies the advanced diagnostic study (including attenuation correction, qualitative or quantitative wall motion, ejection fraction by first pass or gated technique and additional quantification, when performed), is a separately billable procedure.  This procedure is billable under CPT code 78452.  Further, this procedure is segmented into a professional component and a technical component.  To bill for only the technical component, the modifier TC is appended to code 78452 – the technical component of CPT code 78452 requires general supervision.  To bill for only the professional component of CPT code 78452, the modifier 26 is appended to code 78452.  The billing physician must personally perform the professional component of code 78452 and, therefore, the concept of physician supervision or any particular level of physician supervision does not apply.  The global code, encompassing both the technical and professional component is simply billed as CPT code 78452 (without any modifiers).  Because this code, as billed, includes services that must be performed by the billing physician (the professional component) – the concept of physician supervision or any particular level of physician supervision does not apply.

79.     As set forth in more detail below, all the steps described above and required in the performance a nuclear stress test (ordering of radiopharmaceuticals, administering intravenous radioactive dye, monitoring a patient while performing the rest and stress portion of the test, determining when a patient's heart rate may be nearing dangerous levels) are performed by Digirad's traveling employees.  The interpretation of the nuclear images and compiling a complete nuclear cardiology report is performed by Digirad's remote offsite employees.

80.     The only task that the Contracted Physician performs in the provision of cardiac nuclear stress tests is ostensibly the "supervision component" – which Digirad informs its

Contracted Physicians means that they must "just be under the same roof." Pursuant to the Palmetto Cardiac Radionuclide Imaging LCD, however, the Contracted Physician is not qualified to perform, and does not perform, this component of the test.[34]

## **DEFENDANT'S FRAUDULENT SCHEMES**

### A. Digirad Causes False Claims to be Submitted to Medicare by Making False Representations and Encouraging Physicians to Submit False Claims.

81.    To entice physicians to retain Digirad's services, Digirad emphasizes the purportedly minimal (practically nonexistent) responsibilities that the physician will have to perform and large windfall profit if the physician refers a high volume of patients for cardiac nuclear stress tests. Specifically, Digirad instructs its sales staff to falsely represent to physicians that the only requirement of the Contracted Physician is to "be present under the same roof (not in the room)" during stress portion of testing and that, by doing so, they can receive $290,000 in annual profit from the Medicare program by billing for cardiac nuclear stress tests performed entirely by Digirad staff.

82.    Digirad's misrepresentation is calculated to mislead the Contracted Physicians into believing that all that is required of them is that they be in the building when cardiology stress procedures are performed by Digirad – which is patently untrue. Digirad's misinformation fails to convey to the Contracted Physicians material Medicare requirements and conditions of payment. For instance, Digirad deliberately conceals the actual tasks that a supervising physician is required to perform, to-wit: "Medical treatment for complications and side effects of the test; Medical

---

[34] See Palmetto GBA; LCD 33457, Cardiac Radionuclide Imaging; *available at*: https://www.cms.gov/medicare-coverage-database/details/lcd-details.aspx?LCDId=33457&ContrId=375&ver=36&ContrVer=1&CntrctrSelected=375*1&Cntrctr=375&s=All&DocType=Active%7cFuture&bc=AAgAAAQAAAAA& (A "qualified physician must perform Medical treatment for complications and side effects of the test; Medical services required as part of the test such as injections of medications; Medical expertise in the interpretation of the cardiovascular stress test component, some of which has to be provided during the test and before the patient is discharged from the testing suite.)[34]

services required as part of the test such as injections of medications; Medical expertise in the interpretation of the cardiovascular stress test component, some of which has to be provided during the test and before the patient is discharged from the testing suite."[35] This litany of required tasks (along with being immediately available and not performing another uninterruptible procedure to actually meet the definition of "direct supervision") is a far cry from simply "being under the same roof."

83.     Not only does Digirad fail to inform Contracted Physicians of these requirements, but Digirad – as the advanced diagnostic imaging specialist – provides no training, direction or education to Contracted Physicians to allow a primary care physician, internist, or family medicine physician to gain the requisite nuclear medicine and cardiology expertise in order to legally furnish and bill for cardiac nuclear stress tests under their own NPI number.

84.     Moreover, Digirad's false representation that the Contracted Physicians' lone responsibility is to be "under the same roof" while Digirad employees perform stress tests imparts no cognizable explanation for why the Contracted Physicians can legally bill for the provision of Myocardial Perfusion Imaging and interpretation under CPT code 78452.   When Relator Livingston questioned Digirad about this specific issue, Digirad's response was that Digirad's accreditation status would extend to the newly Contracted Physician's office immediately on a provisional basis and then with full IAC accreditation.

85.     Digirad's statement is false and misleading for several reasons.  First, to bill for the global CPT code 78452 (which Digirad Contracted Physicians do), or the professional component of this CPT code, the billing physician must perform the service personally.  Digirad's Contracted

---

[35] See Palmetto GBA; LCD 33457, Cardiac Radionuclide Imaging; *available at*: https://www.cms.gov/medicare-coverage-database/details/lcd-details.aspx?LCDId=33457&ContrId=375&ver=36&ContrVer=1&CntrctrSelected=375*1&Cntrctr=375&s=All&DocType=Active%7cFuture&bc=AAgAAAQAAAAA&

Physicians are not qualified to perform the service and, in fact, do not perform the service personally. Second, even if the Contracted Physician billed for only the technical component of CPT code 78452 using the modifier TC – which requires general supervision over a qualified nuclear technician performing the service – Digirad's Contracted Physicians do not exercise valid general supervision over the service.

86.     Pursuant to the applicable regulation, general supervision exists where "the procedure is furnished under the physician's overall direction and control, but the physician's presence is not required during the performance of the procedure...the training of the non-physician personnel who actually perform the diagnostic procedure and the maintenance of the necessary equipment and supplies are the continuing responsibility of the physician."[36]

87.     Parsing out this regulatory requirement exposes the violations committed by Digirad's business model – the Contracted Physicians cannot maintain overall direction and control of cardiac nuclear imaging service because they are unqualified to do so. Moreover, maintaining overall direction and control of Digirad nuclear imaging services clearly falls under the purview of each facility's Medical Director, who – according to IAC accreditation requirements – is "[r]esponsible for all nuclear services provided including quality control (QC), radiation safety, quality of care and appropriateness of care."[37]

88.     Digirad's explanation of its nuclear medicine procedure billing contained in its contracts with the Contracted Physicians and as explained to Relator confirms the Medical

---

[36] 42 C.F.R §410.32 (c)(i).

[37] The IAC Standards and Guidelines for Nuclear/PET Accreditation; Section 1.1.2A. (Sept. 15, 2016); available at: https://www.intersocietal.org/nuclear/standards/iacnuclearpetstandards2016.pdf (more specifically: "Medical Director Responsibilities include assur[ing] compliance with all policies/procedures/protocols and will review and update clinical/radiation safety manuals at a minimum annually; active over of radiation safety within the facility and provide final interpretation/report of some nuclear medicine procedures for the facility.").

Director's responsibility for the general supervision of cardiac nuclear stress test, stating: "The Medical Director is responsible for reviewing our nuclear medicine procedures." Therefore, Digirad knows that the Medical Director, a Digirad employee, not the Contracted Physician, is exercising the required general supervision and that the Contracted Physician does not have the qualification, experience, expertise and credentials to exercise general supervision over the nuclear medicine procedures.

### B. Digirad's Contracts and Contracted Physician Billing Practices are Contrary to IAC Standards and in Violation of Medicare Conditions of Payment.

89.     Digirad effects its completely out-sourced advanced diagnostic testing scheme by performing a "bait and switch" on Contracted Physicians, IAC and CMS.  The primary point of disconnect is the amount of responsibility, supervision, and participation in the performance of the procedures required of the Contracted Physician.  Whereas Digirad's business model allows for the Contracted Physicians to do essentially nothing other than be in the building, CMS requirements for accreditation under IAC standards and the Palmetto Cardiac Radionuclide Imaging LCD for Medicare coverage require much more.  As such, the accreditation requirements and Medicare conditions of payment are not met, and the claims that Digirad's business model causes to be submitted by the Contracted Physicians are false.

90.     The scheme works as follows: CMS, by and through the IAC, wants to ensure that advanced diagnostic services are being performed safely, effectively and only when medically necessary – as a result, the accreditation standards were established.  Therefore, the IAC (and other accrediting agencies) require trained and knowledgeable medical professionals to perform the discrete procedures involved in a cardiac nuclear stress test and require the IAC Medical Director and IAC Technical Director to exert significant supervision over the specifically credentialed

medical and technical staff who are performing and interpreting the nuclear medicine tests.[38] Therefore, to gain IAC accreditation, facilities must represent that these specially trained and credentialed medical professionals are overseeing and/or providing the services. Subversively, this is also the narrative that Digirad employs to sell Contracted Physicians on the idea that its practices are legal.

91.     However, CMS, through the Physician Fee Schedule, pays physicians based upon the work that the billing physician has actually performed or supervised in accordance with applicable supervision standards (such as general or direct supervision), not to just outsource to companies like Digirad at a windfall profit to the billing physician who provides no services other than generating referrals.

92.     Herein lies the basic contradiction in Digirad's practices: to gain accreditation and entice physicians, Digirad must represent that its trained medical staff is in control and performing the services and that – based upon Digirad's (fraudulently obtained) accreditation status – it is legal for the Contracted Physicians to bill for these services directly under their own NPI numbers. When, in fact and well known to Digirad, for the Contracted Physicians to legally and legitimately bill for the services provided by Digirad, the Contracted Physicians must represent to Medicare that the Contracted Physicians themselves, not Digirad, are in control of and performing the services. It cannot be both ways.

93.     To effect this scheme, Digirad knowingly utilizes misleading contracts that effectively place all contractual "responsibility" for Digirad's employees and services upon the

---

[38] IAC Standards and Guidelines for Nuclear/PET Accreditation; Section 1.1.2A. (The Medical Director is "responsible for all nuclear medicine services provided including quality control, radiation safety, quality of care and appropriateness of care.[38]  These responsibilities include but are not limited to: assuring compliance with all policies/procedures/protocols… active oversight of radiation safety within the facility… and the Medical Director must be a member of the facility and provide final interpretation/report of some nuclear medicine procedures for the facility.); IAC Standards and Guidelines for Nuclear/PET Accreditation; Section 1.1.2A. *supra*(The Technical Director is responsible for all day-to-day operations of the facility)

Contracted Physicians, when in fact this is not possible under Digirad's model, particularly since the Contracted Physicians are not qualified to do so. Inherently, Digirad's contracts directly contradict the representations Digirad makes in order to gain advanced diagnostic imaging accreditation.

94.      In its contracts, Digirad removes the responsibility for all operations and performance of nuclear stress tests and related imaging from remote Digirad employees actually performing the role of Medical Director and Technical Director and places a phantom responsibility of control and supervision of *Digirad's* nuclear technicians on the Contracting Physicians who Digirad knows have no knowledge or experience with radioactive nuclear isotopes nor knowledge or experience in the technical aspects of procuring an accurate advanced diagnostic image. Essentially, Digirad's contracts (and the Contracting Physicians' representations upon billing) falsely state that the Contracting Physicians will be responsible for control and supervision, when in reality Digirad performs these functions.

95.      The Digirad Service Agreement Standard Terms & Conditions [Digirad Contract] that was provided to Mr. Livingston places this encompassing responsibility on the "Provider" -- in this case Lister Healthcare and corresponding Test Site of 1309 West State Street, Tuscumbia, AL 35674, which is a radiology clinic operated by Mr. Livingston's company.

96.      The Digirad Contract defines the term "Personnel" as "qualified medical technicians" supplied to the Provider by Digirad. Specifically, the Digirad Contract provides:

> Under this Service Agreement ("Agreement") Digirad will supply to Provider qualified medical technicians ("Personnel") and/or the imaging equipment identified in this Agreement ("Equipment") that Provider uses in its performance of certain modalities of diagnostic imaging ("Test" or "Testing") on a schedule mutually agreeable to the parties. The equipment and Personnel must be used in appropriate and adequate space by Provider at the Test Site. Digirad requires Personnel to comply with Provider's instruction, standard,

> rule, training, policy, procedure and protocol to the extent they do
> not interfere with applicable radioactive materials rules and
> regulations.

97.     From this initial provision of the Digirad Contract, several logical inconsistencies arise.  First, the notion that the Provider "***uses*** Digirad supplied qualified medical technicians and/or imaging equipment in ***its*** performance of certain modalities of diagnostic imaging," is a complete farce.  In reality and as presented in Digirad's sales pitch, the Provider does not ***use or perform*** anything related to the nuclear stress test, the Provider just: (a) refers; (b) remains in the building; and (c) bills.  Second, it is nonsensical that Digirad could require its Personnel, who are Digirad employees, required by CMS by way of the IAC certification to be specifically trained and certified in nuclear medicine, to "comply with the Provider's instruction, standard, rule, training, policy, procedure and protocol," when the Provider is a general practitioner with no background, training or experience in nuclear medicine.  In other words, the Contracted Physician cannot rely and defer to the expertise of credentialed Digirad's employees regarding nuclear medicine while simultaneously instructing, training and supervising Digirad's employees in nuclear stress procedures despite not having any expertise, experience, or credentials in nuclear medicine.

98.     More specifically turning the CMS mandated IAC accreditation on its head, the Digirad Contract provides:

> Provider is solely responsible for the control and supervision of the Personnel to the same
> extent as if Provider employed the Personnel directly.  Specifically, Provider shall maintain
> such direction and control over Personnel as is necessary to conduct Provider's business
> and shall be responsible for the daily on-site supervision and work direction of Personnel.

99.     Placing "sole responsibility for control and supervision of the Personnel to the same extent as if Provider employed the Personnel directly" is in direct contradiction to the IAC Standards and the intent of MIPPA.  Moreover, to require the Provider [with no qualifications or

background in nuclear medicine] to be responsible for the daily on-site supervision and work direction of Personnel [who are trained and actually performing the nuclear stress tests] is a violation of the IAC Standards for Medical Directors, who are required to be "responsible for all nuclear medicine services provided including quality control, radiation safety, quality of care and appropriateness of care."[39] This is also in direct contradiction to the IAC requirements for Technical Directors, who must be responsible for the day-to-day operations of the facility.[40]

100.    The delegating of its required supervisory duties to untrained and uncredentialed "Providers" (the Contracted Physicians) is also prevalent in Digirad's performance of the Interpretation portion of the nuclear stress test.

101.    In an attachment, appended to the Digirad Contract denoted "Digirad Accreditation Services Attachment" that Digirad gave to Relator in its sales pitch, Digirad provides:

> Provider must, at its own cost and expense, select and maintain a reading physician that meets the standards set forth by the Accrediting Body for reading physicians and ensure that the reading physician issues compliant interpretation reports, preferably using the tool provided by Digirad.

102.    Directly contradicting that provision, however, Digirad provides the "Reading Physician" and the tool used to compile interpretation reports.  As such, this provision is another sleight of hand that Digirad employs to place responsibility in word only upon the Provider/Contracted Physician to create the appearance that the Contracted Physician is performing or directing the procedure, when he or she is not.

103.    Digirad's misleading contracts demonstrate its knowledge that the Contracted Physicians are required to direct, supervise and perform the procedures for which Digirad instructs

---

[39] See The IAC Standards and Guidelines for Nuclear/PET Accreditation at p. 6; Section 1A. (Sept. 15, 2016); available at: https://www.intersocietal.org/nuclear/standards/iacnuclearpetstandards2016.pdf.

[40] *Id.* at 7.

the Contracted Physicians to bill federal healthcare programs at a windfall profit.  Moreover, the merely pre-textual contract places all liability on the Contracted Physicians for acting under Digirad's false instructions that it is permissible for the Contracted Physician to bill for services provided by Digirad.  The Contract provides:

> Digirad shall under no circumstances have liability for, and Provider represents that: (a) it is complying and will continue to comply with contractual requirements, policies, medical standards, laws and regulations regarding reimbursement, billing and collection with respect to health care services rendered using the Equipment and/or Personnel.

104.    As evidenced by this language, Digirad knowingly attempts to insulate itself in the event its false and misleading business model may be called into question, when in fact Digirad is controlling, directing and performing all meaningful aspects of the cardiac nuclear stress tests and falsely informing physicians that these practices are legal.

105.    Digirad also attempts to place liability on Contracted Physicians (and shield itself) from liability resulting from nuclear medicine interpretation services which are performed by Digirad's own reading physicians, providing in its contract:

> ***Digirad shall have no liability or responsibility whatsoever for interpretations or other professional services rendered by*** any third party retained or used by Provider including over-readers ***and authorized users*** and Provider agrees to hold Digirad harmless from any and all such liability, including without limitation a claim by a patient or claims for payment by the third party.

106.    In fact, in practice as evidenced by Digirad's explanation of its process to Relator, Digirad provides, directs and wholly supervises the reading physicians, who are also referred to within the IAC framework as "Authorized Users."  Digirad describes the role of Authorized Users as: "all of our Reading Physicians -- who give written authorization for the nuclear medicine technologists to inject the radiopharmaceuticals."

107.    Digirad also uses a misleading contract to create the illusion that the Contracted Physician is directing the orders for radiopharmaceuticals, all the while knowing that the

Contracted Physicians do not have the required radioactive materials license to even place such an order. Digirad uses the following form language to create this illusion:

> When a nuclear test is ordered and to be performed using Digirad equipment and personnel, I request that Digirad provide any of the following radiopharmaceutical(s) as standard protocol for my patients:
>
> Tc-99m Sestamibi
> Tl-201 Thallous Chrloride
> Tc-99m Tetrofosmin

108.   This "standard protocol" provided by Digirad does not rise to physician direction or supervision, of any level, merely by the physician signing a boilerplate form as part of the contract provided by Digirad.

109.   Moreover, on this same Pharmaceutical Order Protocol Form, Digirad seeks the Contracted Physician's permission to outsource the supervision component of the cardiac stress procedures, stating:

> If a patient becomes compromised and intervention is required to maintain normal cardiac function, I hereby order Digirad clinicians to follow ACLS protocols unless I directly instruct them to deviate from that protocol.

110.   Therefore, the Digirad business model requires the signing away of a clinical duty to supervise a patient who is suspected of having coronary artery disease or other major heart problems and who has radioactive dye pumping through his or her heart while the patient is presumably pushing himself or herself to exertion. This language directly contradicts the condition of payment in the Palmetto LCD requiring the billing physician to provide direct supervision of cardiac stress procedures and also endangers patients. Therefore, Digirad knowingly causes its Contracted Physicians' to bill false claims for payment.

### C. Digirad's Pricing Model and Offer and Provision of Illegal Remuneration Violates the Anti-Kickback Statute.

111.   The price for Digirad's services is represented to be $1,750.00 per service day,

39

which corresponds to $437.50 per patient for the first four patients. The Digirad "service day" is 4.5 hours per day, and Digirad imposes terms of 50 service days per year. This price provides a bundled package of goods and services necessary to perform nuclear stress tests, including a certified nuclear tech, an ACLS stress tech, the nuclear camera, IV supplies, accreditation fees and maintenance, PACS, precertification and both isotope doses.

112.     Therefore, Digirad is guaranteed a minimum of $87,500 annually, or a total of $175,000 over two years, upon securing a nuclear stress test contract with a given physician. By Digirad's projections, the minimum patient volume corresponding to the minimum contract is 200 patients annually who must be referred to a specialized, advanced diagnostic heart procedure per year. The onus to get this patient volume of nuclear stress test to cover the mandatory costs of the contract is then on the Contracted Physician. Digirad, however, is paid its $87,500 per year either way, while the physician loses money if he or she does not have the patient referral volume to cover payments to Digirad or conversely earns a profit if he or she refers a volume of patients for nuclear stress tests and bills insurers and government health care programs at a level exceeding the payments owed to Digirad.

113.     Further incentivizing high volumes of nuclear stress test referrals by illegal remuneration, Digirad offers that "for each patient after the first four, the price per patient goes down to $375 each" and "Digirad can do up to 10 patients per test day." The profit margin for the Contracted Physicians increases as the volume of patients that they refer for nuclear testing increases. Accordingly, Digirad presents its Contracting Physicians with both a carrot and a stick – failure to secure a minimum number of patient referrals results in a monetary penalty while the profitability of each patient increases when higher numbers of patient referrals are made.

114.    At no time during in-depth discussions with Digirad or in any Digirad contracts or materials, did Digirad inform Relator Livingston that these discounts must be passed on to government healthcare programs.  Instead, Digirad simply emphasizes the easy profit that can be earned by retaining Digirad and maximizing the number of cardiac nuclear stress tests Digirad's employees can perform.

115.    These discounts amount to illegal remuneration in violation of the Anti-Kickback Statute and outside of any "safe harbor" because the reduction in price, provided for each patient after the fourth patient each service day is not properly disclosed and appropriately reflected in the costs claimed or charges made by the provider or entity under a federal health care program.  42 U.S.C. § 1320a-7b(3).  Specifically, Digirad's offered discounts are in violation of the Anti-Kickback Statute because Digirad does not inform buyers [Contracted Physicians] in a manner reasonably calculated to give notice to the buyer of its obligations to report such discounts. *See* 42 C.F.R. 1001.95(h)(2).  To the contrary, Digirad uses these discounts as an enticement to its Contracted Physicians and a selling point for working with Digirad and providing Digirad with high volumes of patient referrals in exchange for increased windfall profits.

116.    Digirad's business model and pricing structure clearly incentivizes and essentially mandates physicians refer a certain quota of patients for a specialized diagnostic cardiac procedure and provides financial remuneration by offering discounts to its Contracted Physicians to reward achieving higher patient volumes.  In exchange for simply being under the same roof (for a portion of advanced diagnostic test procedures) and paying Digirad's requested fees, Digirad represented to Relator Livingston that "a full day of testing would give [a contracted physician] an average profit of $5,800 if ALL patients were just Medicare.  With a commercial payer mix, your profit is even higher."

117.    Therefore, Digirad presents physicians with a "risk-free" proposition that all a primary care physician must do is be in the same building while Digirad employees are performing nuclear stress tests and of course refer the maximum possible number of patients for a niche medical procedure.  In return, each day that the physician can accomplish these two criteria, the physician will make over $5,800 in windfall profit from the Medicare program.  The base level of "service days" is 50 days per year – or an advertised $290,000 annual profit from the Medicare program.  In its pitch to Relator Livingston, Digirad shared its confidential contract terms and repeatedly stressed the easy profit that Livingston and his company and physicians could make from the arrangement.

### D.  Specific Representative Examples of False Claims Paid Based on Digirad's Fraudulent Representations

118.    In an effort to continue to mislead Relator Livingston and convince Relator Livingston that Digirad's practices are legitimate, Digirad informed Relator Livingston of specific Contracted Physicians that have retained Digirad's services.  Medicare billing data reflects that these Contracted Physicians do, indeed, bill Medicare for the precise services described in this Complaint as Digirad represented in its confidential sales pitch to Relator Livingston.  Specifically, Medicare has paid Digirad Contracted Physicians for cardiac nuclear stress studies under CPT code 78452, the cardiac stress procedures including under "global" CPT code 93015 and HCPCS drug codes related to the radiopharmaceuticals used in cardiac nuclear stress tests.

119.    For example, Dr. X is a physician practicing in Opelika, Alabama who specializes in Internal Medicine and Cardiovascular Disease who has retained Digirad's services to perform cardiac nuclear stress tests, which are then billed to Medicare  directly by Dr. X personally.  Dr. X does not meet the specialized training and criteria to perform cardiac nuclear stress studies and procedures.  Further, based upon Digirad's representations that Dr. X is a representative example

of a physician who has engaged Digirad in a contract identical or substantially similar to that presented to Relator Livingston, Dr. X does not actually perform the required tasks nor supervision to bill for cardiac nuclear studies or stress test procedures.

120.   As an example of how Digirad's scheme causes false claims to federal healthcare programs, Dr. X billed Medicare and received payment from Medicare in 2016 for 108 separate cardiac nuclear stress studies under CPT code 78452 pursuant to a contract with Digirad.  The average Medicare payment for these false claims was $320.94.  In conjunction with claiming to have performed these nuclear medicine studies, Dr. X billed Medicare for 109 separate per study doses of radiopharmaceutical Technetium tc-99m sestamibi, and 436 separate per millicurie units of radiopharmaceutical Thallium tl-201 thallous chloride.  Medicare paid an average of $93.36 and $81.90 for each billing of these radiopharmaceuticals, respectively.  In addition, Dr. X billed Medicare for 52 separate cardiac stress procedures under global code 93015, and Medicare paid an average of $45.52 for each of these studies.

121.   Similarly, Dr. Y is a Family Medicine physician practicing in Athens, Alabama who has retained Digirad's services to perform cardiac nuclear stress tests.  Dr. Y does not meet the specialized training and criteria to perform cardiac nuclear stress studies and procedures. Based upon Digirad's representations that Dr. Y is an example of a physician who has engaged Digirad in a contract identical or substantially similar to that presented to Relator Livingston, Dr. Y does not actually perform the required tasks nor supervision to bill for cardiac nuclear studies or stress test procedures.

122.   In 2016, Dr. Y billed Medicare and received payment for 13 separate cardiac nuclear stress studies under CPT code 78452.  The average Medicare payment for these false claims was $274.96.  In conjunction with claiming to have performed these nuclear medicine

studies, Dr. Y billed Medicare for 13 separate per study doses of radiopharmaceutical Technetium tc-99m sestamibi, and 52 separate per millicurie units of radiopharmaceutical Thallium tl-201 thallous chloride.  Medicare paid an average of $86.68 and $68.65 respectively for each billing of these radiopharmaceuticals.  In addition, Dr. Y billed Medicare for "supervision" of 16 separate cardiac stress procedures under code 93016 – Medicare paid an average of $16.29 for each false claim. Dr. Y also billed Medicare for the "tracing" code of the cardiac stress procedure under CPT code 93017, and Medicare paid an average of $21.24 for each false claim.

123.     The false claims submitted by Dr X. and Dr. Y. are merely representative examples of how Digirad's model is calculated to and does in fact result in false claims to federal healthcare programs by all of its Contracted Physicians across its entire nationwide business.

## COUNT ONE

## PRESENTING OR CAUSING TO BE PRESENTED FALSE CLAIMS UNDER 31 U.S.C. § 3729(a)(1)(A)

124.     Relator adopts and incorporates the previous paragraphs as though fully set forth herein.

125.     By and through the fraudulent schemes described herein, Defendant knowingly— by actual knowledge or in deliberate ignorance or with reckless disregard of the truth or falsity of the information—caused to be presented false or fraudulent claims to the United States for payment or approval, to wit: Defendant instructed and encouraged physicians to submit false claims for payment for advanced diagnostic imaging services that Defendant knew the physicians were not qualified to provide and did not actually provide.

126.     Defendant's fraudulent actions, as described *supra*, are part of a widespread, systematic pattern and practice of knowingly causing to be submitted false claims to the United

States and fraudulent billing of the United States through Medicare.

127.     Defendant's fraudulent actions described herein have resulted in damage to the United States equal to the amount paid or reimbursed to Defendant and others by the United States through Medicare and Medicaid for such false or fraudulent claims.

WHEREFORE, Relator demands judgment in his favor on behalf of the United States, and against Defendant, in an amount equal to treble the damages sustained by reason of Defendant's conduct, together with civil penalties as permitted by 31 U.S.C. § 3729, attorneys' fees and costs, and such other, different, or further relief to which Relator may be entitled.

## COUNT TWO

### MAKING OR USING FALSE STATEMENTS OR RECORDS MATERIAL TO A FALSE CLAIM UNDER 31 U.S.C. § 3729(a)(1)(B)

128.     Relator adopts and incorporates the previous paragraphs as though fully set forth herein.

129.     By and through the fraudulent schemes described herein, Defendant knowingly— by actual knowledge or in deliberate ignorance or with reckless disregard of the truth or falsity of the information—made, used, or caused to be made or used, false records or statement material to a false or fraudulent claim or to get a false or false claim paid or approved by the United States, to wit: Defendant created or used false documentation to fraudulently gain required advanced diagnostic imaging accreditation; false and misleading statements to physicians to cause false claims to be submitted; false and misleading contracts and other false records to support fraudulent billing to the United States, all in violation of 42 U.S.C. §1395y, 42 U.S.C. §1395m and the governing Medicare conditions of payment.

130.     The false records or statements described herein were material to the false claims

submitted or caused to be submitted to the United States.

131.    In reliance upon Defendant's false statements and records, the United States paid false claims that it would not have paid if not for those false statements and records.

132.    Defendant's fraudulent actions described herein have resulted in damage to the United States equal to the amount paid or reimbursed to Defendant and others by the United States for such false or fraudulent claims.

WHEREFORE, Relator demands judgment in his favor on behalf of the United States and against Defendant, in an amount equal to treble the damages sustained by reason of Defendant's conduct, together with civil penalties as permitted by 31 U.S.C. § 3729, attorneys' fees, costs, interest and such other, different or further relief to which Relator may be entitled.

## COUNT THREE

### FEDERAL FALSE CLAIMS BASED ON ANTI-KICKBACK STATUTE
### 31 U.S.C. § 3729(a)(1)(A); 42 U.S.C. § 1320a-7b(b)

133.    Relator adopts and incorporates the previous paragraphs as though fully set forth herein.

134.    Defendant knowingly presented or caused to be presented numerous false or fraudulent claims for payment or approval in violation of 31 U.S.C. §3729(a)(1)(A).

135.    By virtue of illegal remuneration (in violation of the Anti-Kickback Statute, 42 U.S.C. § 1320a-7b(b)) and submissions of non-reimbursable claims described above, Defendant knowingly presented or caused to be presented false or fraudulent claims for the improper payment or approval of advanced diagnostic testing services on behalf of federal health care beneficiaries.

136.    The United States, unaware of the falsity or fraudulent nature of the claims that Defendant caused, paid for claims that otherwise would not have been allowed.

137.    Defendant's fraudulent actions have resulted in damage to the United States equal to the amount paid by the United States as a result of the Defendants' fraudulent claims.

WHEREFORE, Relator demands judgment in his favor on behalf of the United States and against Defendant, in an amount equal to treble the damages sustained by reason of Defendant's conduct, together with civil penalties as permitted by 31 U.S.C. § 3729, attorneys' fees, costs, interest and such other, different or further relief to which Relator may be entitled.

Date: December 13, 2018

JAMES F. BARGER JR.
J. ELLIOTT WALTHALL
ELISE M. FROHSIN

Attorneys for Relators

OF COUNSEL
FROHSIN & BARGER, LLC
100 Main Street
Saint Simons Island, GA 31522
Tel:  205.933.4006
Fax: 205.933.4008

**RELATOR DEMANDS TRIAL BY STRUCK JURY**

## CERTIFICATE OF SERVICE

On this the ⅃3 day of December, 2018, Plaintiff-Relator hereby certifies that in compliance with Rule 4 of the Federal Rules of Civil Procedure, service of the Qui Tam Complaint has been executed as follows:

By Hand Delivery to:

United States Attorney for the Northern District of Alabama
Assistant United States Attorney Clinton Richardson
1801 4th Avenue North
Birmingham, Alabama 35203


By Certified Mail to:

Attorney General of the United States of America
Attn: Colin M. Huntley, Assistant Director, Commercial Litigation Branch
Department of Justice
950 Pennsylvania Avenue, NW
Washington D.C. 20530-0001


_____
Of Counsel