FILED
2022 Sep-08  AM 10:05
U.S. DISTRICT COURT
N.D. OF ALABAMA

# UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF ALABAMA
## SOUTHERN DIVISION

**HAL LIVINGSTON,**
    Plaintiff/Relator,

**v.**

**DIGIRAD CORPORATION,**
    Defendant.

**Case No. 2:18-cv-2058-CLM**

## <u>MEMORANDUM OPINION</u>

On behalf of himself and the United States, Relator Hal Livingston sues Digirad Corporation, asserting that Digirad knowingly violated the False Claims Act ("FCA"), thereby defrauding the United States. (Doc. 43). Digirad moves for summary judgment, asking the court to dismiss all of Livingston's claims. (Doc. 118). As explained within, the court will **GRANT** Digirad's motion for summary judgment on Count II and will **DENY** the motion on Counts I, III, IV, and V.

Digirad also moved to strike testimony from Dr. Christopher Edwards that Livingston relied on in his response to Digirad's motion for summary judgment. (Doc. 138). The court will **DENY AS MOOT** Digirad's motion to strike because the court did not have to consider the testimony in deciding to allow Counts I, III, IV, and V to proceed to trial. Digirad may re-raise this evidentiary issue in a motion in limine.

1

## BACKGROUND

Digirad performs nuclear stress tests for referring physicians. Livingston says that Digirad convinced physicians to bill Medicare to pay Digirad for performing unsupervised nuclear stress tests, in violation of Medicare regulations. So Livingston sued Digirad to recover the Government's money and to penalize Digirad on behalf of the United States, making him a "Relator" under the False Claims Act.

To help the reader better understand Livingston's claims, the court discusses Digirad's business model and Medicare's requirements below.

### I.     The Nuclear Stress Test

The myocardial perfusion imaging test, also called a nuclear stress test, shows how well blood flows through a patient's heart. The test has four steps: (1) a medical provider intravenously injects radioisotopes—*i.e.*, radioactive dye—that serve as tracers; (2) a technician takes images of the patient's heart at rest; (3) to increase blood flow, the patient either walks on a treadmill (physical stress) or the medical provider injects a medication called Lexiscan (chemical stress); and (4) the technician takes a second set of images to see how well the patient's heart is perfused with blood. (Doc. 123 at 8).

There is a technical and professional component to every nuclear stress test. The technical component involves ordering the radioisotopes, injecting the radioisotopes into a patient, capturing the nuclear medicine images, and general supervision of the procedure. (Doc. 132 at 9). The professional component involves a certified physician analyzing the images. (Doc. 123 at 16). Only the technical component is at issue. (*Id.*).

### II.    Medicare's Requirements

There are two relevant requirements for physicians (or entities) who bill Medicare for the technical component of a nuclear stress test. First, the billing physician must exercise general supervision over the test:

> **General supervision** means the procedure is furnished under the physician's overall direction and control, but the physician's presence is not required during the performance of the procedure. Under general supervision, the training of the nonphysician personnel who actually perform the diagnostic procedure and the maintenance of the necessary equipment and supplies are the continuing responsibility of the physician.

42 C.F.R. § 410.32 (b)(3)(i). Second, the billing physician must be accredited by a designated accrediting organization and have a nuclear license to dispense radioactive isotopes. *See* Centers for Medicare & Medicaid Services ("CMS"); Accreditation Requirements for the Advanced Diagnostic Imaging Technical Component, p. 9, available at https://www.cms.gov/Medicare/ProviderEnrollmentandCertification/Med icareProviderSupEnroll/downloads/TranscriptFrom20110623ADIAccred Call.pdf; *see* 42 U.S.C. § 1395m(e); 42 U.S.C. § 1395y(a)(23); 42 C.F.R. 414.68(b).

## III.   Billing Medicare

Physicians who bill Medicare certify on CMS Form 855I that: "I agree to abide by the Medicare laws, regulations, and program instructions that apply to me or the organization listed on section 4A of this application. . . . I understand that payment of a claim by Medicare is conditioned upon the claim and underlying transaction complying with such laws, regulations and program instructions (including but not limited to, the Federal Anti-Kickback Statute . . . and the Physician Self-Referral Law (Stark Law))." https://www.cms.gov/Medicare/CMS-Forms/CMS-Forms/Downloads/cms855i.pdf.

Physicians bill Medicare by submitting charges on CMS Form 1500. On that form, Physicians insert CPT codes for the procedures performed. The CPT codes for a nuclear stress test are: 78452, 93016, 93017, A9500, A9595, and J2785.

## IV.   Digirad's Business Model

Digirad provides medical diagnostic services. Digirad contracts with billing physicians and physicians' practices to provide services related to mobile diagnostic imaging, solid-state nuclear imaging, and related cardiac monitoring. (Doc 65 at 3; doc. 126-6). The billing physician orders and schedules the nuclear stress tests. Digirad performs insurance precertification services to ensure that the patients' insurance companies will cover the procedure. (Doc. 123 at 20). Then Digirad arranges for a board-certified nuclear cardiologist or radiologist specialist to (1) authorize radiopharmaceutical procurement and injection and (2) delegate authority to Digirad's nuclear medical technician to make dosage calculations based on the time of the patients' appointments. (Doc. 123 at 18 (citing doc. 120-6 ¶¶ 14, 16–19)).

On its scheduled day, Digirad employees travel to the billing physician's office and bring the equipment, personnel, and medications/ radioisotopes needed to perform nuclear stress tests. (Doc. 127-1 at 27; doc. 127-5 at 39). Digirad employees conduct the technical component of the nuclear stress tests in the physician's office.[1] And Digirad arranges for a board-certified nuclear cardiologist or radiologist specialist to interpret the images—*i.e.*, conduct the professional component of the nuclear stress tests. (Doc. 123 at 18). At the end of the service day, Digirad gives the physician's office a "complete record of the patients cared for, the services provided, and associated billing codes." (Doc. 94-1 at 10; *see also* doc. 127-2 at 128–29; doc. 127-6 at 12, 18). The physician's office then bills the patients' insurance companies—including Medicare—for the technical component of the nuclear stress tests and for the agents and chemicals used to conduct the nuclear stress tests. (Doc. 127-2 at 132–33). And the billing physician pays Digirad for its services under the billing physician's contract with Digirad.

---

[1] Corporate representatives for APC and SKHC testified that at least one doctor was always in the office when Digirad employees performed the nuclear stress tests. (Doc. 127-2 at 111; doc. 127-4 at 44–45).

### V.     Digirad's Contracts with Billing Physicians

The billing physician pays Digirad a daily fee of $1,600.00 to $1,750.00 for Digirad to provide nuclear stress tests for up to four patients and an additional $363.00 to $375.00 per patient fee after the first four patients (up to 10 patients per day), meaning the billing physician keeps more money per patient if he refers more than four patients for each service day. (Doc. 126-7; doc. 43-2 at 4). The contracts specify that Digirad will provide the radioactive materials license and will dispose of the radiopharmaceuticals provided under Digirad's license. (Doc. 126-7). The contracts also specify that billing physicians are "solely responsible for the control and supervision of the Personnel" and are "solely responsible for the performance of any and all patient care." (*Id.* at 13).

Along with the Service Contracts, the billing physicians and Digirad executed a Memoranda of Understanding ("MOU"), which provides that, as the holder of the Radioactive Materials License ("RML"), Digirad would control the "training and supervision of Digirad and the Clinical Facility Staff, control and handling of radioactive materials, and responsibility for compliance with the Rules and the RML holder's policies and procedures." (Doc. 126-13 at 12; doc. 126-14 at 13).

The contracts also specify that Digirad handles the accreditation requirements for its billing physicians and uses the Intersocietal Accreditation Commission ("IAC") as its accrediting organization. (Doc. 126-13 at 10; doc. 126-14 at 10). "The [IAC] accredits imaging facilities specific to nuclear cardiology, general nuclear medicine and positron emission tomography (PET)." (Doc. 43, Ex. 1, p. 4). The IAC defines a nuclear cardiology, general nuclear medicine, or PET facility as: "consist[ing] of at least one nuclear imaging camera, a qualified physician and a nuclear medicine technologist." (*Id.*). The IAC requires that a Medical Director be "responsible for all nuclear medicine services provided including quality control, radiation safety, quality of care and appropriateness of care" and that a Technical Director be responsible for the day-to-day operations of the facility. (*Id.* at 6–7).

## VI.   Livingston's Interactions with Digirad

Livingston founded Lister Healthcare, a company that provides services to physicians. In April 2016, Digirad employees contacted Livingston to see if Digirad could provide diagnostic imaging solutions for the physicians' offices Livingston managed. (Doc. 65 at 3). Eventually, Digirad sent Livingston a proposed contract. (Doc. 43-2). Livingston called and recorded telephone conversations with the office managers for two of Digirad's billing physician practices—Athens Primary Care ("APC") and Shoals Kidney and Hypertension Center ("SKHC"). (Doc. 43 at 2–3). After gathering information, Livingston sued Digirad, alleging that its business model violates the FCA. The court has held that Livingston's complaint contained sufficiently reliable allegations about claims submitted by APC and SKHC (doc. 57), meaning that only APC and SKHC claims are viable.

## STANDARD OF REVIEW

Summary judgment is appropriate when there is no genuine dispute of material fact and the moving party is entitled to judgment as a matter of law. FED. R. CIV. P. 56(a). A genuine dispute of material fact exists when "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). "The mere existence of a scintilla of evidence in support of the plaintiff's position will be insufficient; there must be evidence on which the jury could reasonably find for the plaintiff." *Id.* at 252.

# ANALYSIS

Livingston pleads five counts under the first three FCA subsections. This chart briefly lists the different theories as Livingston explains them:

| Count I | § 3729(a)(1)(A) | Digirad caused the billing physicians to directly submit false claims by assisting the billing physicians with billing for the technical component of MPI exams when the billing physicians didn't exercise general supervision over the exams. |
|---|---|---|
| | | Digirad caused the billing physicians to falsely imply that they had complied with Medicare law and regulations making the certifications on the billing physicians' 855I forms false. |
| | | (Doc. 43 ¶¶ 128–29) |
| Count II | § 3729(a)(1)(B) | Digirad made or used false records or statements material to false CMS 1500 claim forms submitted to Medicare for payment. |
| | | Digirad made or used false records or statements material to false certifications on CMS 855I forms. |
| | | (Doc. 43 ¶ 133) |
| Count III | § 3729(a)(1)(A) | Digirad caused the billing physicians to present false or fraudulent claims for the improper payment of the technical component of MPI exams when the services were procured through illegal remuneration in violation of 42 U.S.C. § 1320a-7b(b) (the Anti-Kickback Statute). |
| | | (Doc. 43 ¶ 139) |

| Count IV | § 3729(a)(1)(A) | Digirad caused the billing physicians to present false or fraudulent claims for the improper payment of the technical component of MPI exams when the services were tainted by prohibited referrals in violation of 42 U.S.C. § 1395nn (the Stark Law). (Doc. 43 ¶¶ 144–45) |
| Count V | § 3729(a)(1)(C) | Digirad conspired with the billing physicians, including those at APC and SKHC, to submit false claims to Medicare. (Doc. 43 ¶¶ 149 – 55) |

To succeed on these various FCA claims, Livingston must generally prove that Digirad (1) caused to be made a false claim, (2) which was presented for payment or approval, (3) with knowledge that the claim was false. *See* 31 U.S.C. §§ 3729(a)(1)(A), 3729(a)(1)(B). And a misrepresentation must be material to the Government's payment decision to be actionable under the FCA. *See Universal Health Servs., Inc., v. United States ex rel. Escobar*, 579 U.S. 176, 181 (2016).

Digirad moves for summary judgment on all five counts. In doing so, Digirad makes 10 arguments for dismissal, some of which apply to multiple counts and contain several arguments of their own. The court addresses the arguments in the order that Digirad raised them.

## I.  Public Disclosure Bar

First, the court "consider[s] whether the FCA's public disclosure provision bars this lawsuit." *United States ex rel. Osheroff v. Humana Inc.*, 776 F.3d 805, 812 (11th Cir. 2015). The FCA's "public disclosure bar" states:

> (A)  The court shall dismiss an action or claim under this section . . . if substantially the same allegations or transactions as alleged in the action or claim were publicly disclosed—
>
> > . . .
> >
> > (ii)  in a congressional, Government Accountability Office, or other Federal report, hearing, audit, or investigation; or
> >
> > (iii)  from the news media,
>
> unless the action is brought by the Attorney General or the person bringing the action is an original source of the information.

31 U.S.C. § 3730(e)(4)(A). Public disclosures must contain enough information to "alert[] the government to the . . . nature of the fraud and enable[] the government to [pursue] an investigation." *United States ex rel. Jamison v. McKesson Corp.*, 649 F.3d 322, 329 (5th Cir. 2011).

The Eleventh Circuit uses a three-part test to determine whether public disclosures require dismissal of a qui tam lawsuit: (1) whether the "allegations made by the plaintiff [have] been publicly disclosed"; (2) if so, whether the disclosed information is substantially the same as the allegations in the plaintiff's lawsuit; and (3) if so, whether the plaintiff is "an 'original source' of that information." *Osheroff*, 776 F.3d at 812 (quoting *Cooper v. Blue Cross Blue Shield of Florida, Inc.,* 19 F.3d 562, 565 n.4 (11th Cir. 1994)).

**A. Public Disclosure**

The court finds that Digirad publicly disclosed one of Livingston's allegations: that Digirad didn't require billing physicians to be authorized users on Digirad's RML to bill for the technical component of a nuclear stress test. Livingston's other allegations have either not been publicly disclosed or are not substantially similar to the public disclosures that Digirad points to. For example, Digirad says that Livingston's allegations are based, in part, on the statement on Digirad's blog that "the lead [billing] physician supervises Digirad staff" and that billing physicians "are responsible for [the imaging provider's] actions and behavior." (Doc. 118-5 at 16, 38). But Livingston alleges the opposite; he says the billing physicians who bill for the nuclear stress tests ***do not*** provide general supervision as required by 42 C.F.R. § 410.32(b)(3)(i). Digirad has not pointed to a public statement that says Digirad provides its services ***without*** supervision by the billing physician—which, as you will see as the opinion continues, is the primary point of contention on all counts.

So the only allegation that moves to step two is the allegation that Digirad didn't require billing physicians to be authorized users on Digirad's RML to bill for the technical component of a nuclear stress test.

**B. Substantially the Same**

Digirad says this about RML authorization on its website:

- I AM NOT AN AUTHORIZED USER; CAN I STILL OFFER MOBILE NUCLEAR IMAGING?
  Yes. You do not need to be board certified in nuclear cardiology to take advantage of a mobile imaging service. Your mobile imaging provider can assist with all related licensing requirements and put you in contact with an authorized user to read your patients' images. (Doc. 118-5 at 22).

- Completely Outsourced

  If you use one of our Digirad Select packages that includes equipment, you are able to leverage Digirad's radioactive materials license. By listing your office as a location of use on our existing license, you can avoid all the costs and expenses of licensing your own facility. Digirad will maintain and ensure the required protocol, including radiation safety program, physics, meeting notes, etc. (*Id.* at 18).

These posts disclose that Digirad did not require billing physicians to be authorized users on a RML to offer nuclear imaging services. And this disclosure is "substantially the same" as Livingston's allegation about RML authorization. 31 U.S.C. § 3730(e)(4).

So the court must now consider whether Livingston's allegations are "supported by" this publicly disclosed information, *see Cooper*, 19 F.3d at 567, keeping in mind that this second prong of the three-pronged public disclosure inquiry is meant to be "a quick trigger to get to the more exacting original source inquiry." *Osheroff*, 776 F.3d at 814.

Digirad's public disclosure support Livingston's allegation enough to pull the trigger on step three review. Livingston's amended complaint uses the billing physician's lack of RML authorization to support the claim that Digirad induced billing physicians to bill for services they didn't provide. For example, the amended complaint states three reasons why Livingston thinks the billing physicians didn't provide general supervision over the technical component of the nuclear stress test. (Doc. 43 at 24). The third reason is that billing physicians cannot supervise the technical component because it would go against IAC requirements, state nuclear licensing requirements, and Medicare conditions of payment. (*Id.* at 39–48). Within this section of his complaint, Livingston asserts that the billing physicians were not exercising general supervision because, among other things, they do not have the required radioactive materials license to order radiopharmaceuticals. (*Id.* at 46).

11

Plus, in arguing that Digirad caused the billing physicians to falsely bill for a procedure they didn't supervise, Livingston repeatedly relies on the fact that none of APCA or SKHC's physicians have RML authorization. (Doc. 132 at 27–35). This overlap between the RML authorization disclosures on Digirad's website and Livingston's allegations is enough to satisfy the second prong of the public disclosure inquiry. *See Osheroff*, 776 F.3d at 814 ("A plaintiff basing an FCA qui tam claim *in any part* on publicly disclosed information must demonstrate that the plaintiff is an original source of that information." (cleaned up)).

## C. Original Source

So the court must now consider whether Livingston is an "original source;" that is, a person who has "knowledge that is independent of and materially adds to the publicly disclosed allegations or transactions." 31 U.S.C. § 3730(e)(4)(B). A relator isn't an original source if he possesses only background information, which lets him understand that public disclosures reveal that the defendant is committing fraud. *See Osheroff*, 776 F.3d at 815.

The court finds that Livingston has knowledge that is both "independent of and materially adds to" Digirad's public disclosure that it doesn't require billing physicians to have RML authorization before using mobile nuclear imaging. 31 U.S.C. § 3730(e)(4)(B).

Again, the crux of Livingston's claim is that Digirad caused the billing physicians to impermissibly receive Medicare payments by falsely claiming that the billing physicians performed or supervised services that Digirad's employees exclusively performed and supervised. That Digirad doesn't require billing physicians to have RML authorization—the only publicly disclosed allegation—is just one piece of the complaint's larger puzzle. Other pieces include Livingston's assertions (a) that Digirad provides all employees, supplies, supervision, and equipment for nuclear stress tests, (b) that Digirad's only requirement for billing physicians is that they be in the building during the technical component of the test,

and (c) that the billing physicians don't even know what services Digirad has performed until Digirad tells them after the fact. Livingston didn't learn this information from Digirad's website, the news media, or a federal report. Instead, Livingston learned it through Digirad's sales pitch to him and his later conversations with the office managers at APC and SKHC.

This independent knowledge is more than background information that helps contextualize the significance of publicly disclosed facts. In fact, the essential element of Livingston's claims is the billing physician's lack of *involvement*—not the physician's lack of RML *authorization*.

To prove the point, consider Livingston's claim if you take one piece from the puzzle. If you remove Livingston's allegations that the billing physicians aren't authorized RML users, you are still left with Livingston's allegations that the billing physicians left all clinical aspects of the nuclear stress tests up to Digirad. So Livingston's basic allegation that Digirad has caused the billing physicians to impermissibly bill for technical components that it performs or supervises remains the same.

But if you instead delete the allegation that billing physicians are not involved in the technical component and keep only the publicly disclosed information that Digirad doesn't require billing physicians to have RML authorization, you've changed the claim. Now, rather than allege that Digirad induces physicians to bill for services they didn't perform or supervise, Livingston's complaint would allege that Digirad has helped billing physicians engage in the unauthorized use of radioactive materials. That's a different claim.

In sum, Livingston has alleged material information—*e.g.* that Digirad performs cardiac stress tests without the billing physician's supervision—that Digirad has not disclosed to the public. So the public disclosure bar doesn't prevent this qui tam suit from going forward.

## II.    Falsity

The FCA makes someone liable if he (1) "knowingly presents, or causes to be presented, a false or fraudulent claim for payment or approval"; (2) "knowingly makes, uses, or causes to be made or used, a false record or statement material to a false or fraudulent claim"; or (3) "conspires to commit a violation of the False Claims Act is liable to the United States . . . ." 31 U.S.C. § 3729(a)(1)(A), (B), (C), (G). "Medicare claims may be false if they claim reimbursement for services or costs that either are not reimbursable or were not rendered as claimed." *United States ex rel Walker v. R&F Props. of Lake Cty., Inc.*, 433 F.3d 1349, 1356 (11th Cir. 2005).

In Counts I and II, Livingston has two theories for why Digirad violated the FCA. Under the first theory, Livingston asserts that Digirad caused the billing physicians to directly submit false claims by assisting the billing physicians with billing for the technical component of MPI exams when the billing physicians didn't exercise general supervision over the exams. (Doc. 43 ¶ 128). Under the second theory, Livingston says that Digirad caused the billing physicians to falsely imply that they had complied with Medicare law and regulations making the certifications on the billing physicians' 855I forms false. (*Id.* ¶ 129). Falsity is a common element to both theories. Digirad argues that the court must dismiss all counts based on these theories because none of APC or SKHC's Medicare claims were false.[2]

### A. Physician Qualifications

Digirad first asserts that none of the claims were false because the billing physicians at APC and SKHC were qualified to (and did) exercise general supervision over the technical component of the nuclear stress tests. Digirad relies on the regulation's plain language to support its

---

[2] Digard also argues that Livingston's false certification claim fails because Livingston neither sought nor produced a Form 855I from the billing physicians during discovery. But we know that the billing physicians are enrolled in Medicare because they've admitted to billing Medicare. So the court rejects this argument.

argument, so the court quotes it in full:

(3) ***Levels of supervision***. Except where otherwise indicated, all diagnostic x-ray and other diagnostic tests subject to this provision and payable under the physician fee schedule must be furnished under at least a general level of supervision as defined in paragraph (b)(3)(i) of this section. In addition, some of these tests also require either direct or personal supervision as defined in paragraph (b)(3)(ii) or (iii) of this section, respectively. When direct or personal supervision is required, supervision at the specified level is required throughout the performance of the test.

(i) ***General supervision*** means the procedure is furnished under the physician's overall direction and control, but the physician's presence is not required during the performance of the procedure. Under general supervision, the training of the nonphysician personnel who actually perform the diagnostic procedure and the maintenance of the necessary equipment and supplies are the continuing responsibility of the physician.

(ii) ***Direct supervision*** in the office setting means the physician (or other supervising practitioner) must be present in the office suite and immediately available to furnish assistance and direction throughout the performance of the procedure. It does not mean that the physician (or other supervising practitioner) must be present in the room when the procedure is performed. Until the later of the end of the calendar year in which the PHE as defined in § 400.200 of this chapter ends or, December 31, 2021, the presence of the physician (or other practitioner) includes virtual presence through audio/video real-time communications technology (excluding audio-only).

(iii) Personal supervision means a physician must be in attendance in the room during the performance of the procedure.

42 C.F.R. § 410.32(b)(3).

The regulation defines "Physician" as "a doctor of medicine or osteopathy legally authorized to practice medicine and surgery by the State in which he performs such ... action." 42 U.S.C. § 1395(r). Digirad argues that Medicare only requires that a physician supervising the technical component of a nuclear stress test be a licensed medical doctor—*i.e.*, the physician need not be a specialist in radiology or cardiology. (Doc. 123 at 36–37). Even if Digirad is right on this point, the point doesn't lead to summary judgment in Digirad's favor. While Livingston does allege that the billing physicians were unqualified to supervise the nuclear stress tests because they did not have RMLs (as discussed below in Section II(B)), Livingston argues that the APC and SKHC physicians did not supervise the nuclear stress tests ***at all***—an allegation that neuters the argument about qualifications. Even the most qualified physician must exercise at least general supervision over the stress test.

Viewing the evidence in the light most favorable to Livingston, a reasonable juror could find that Digirad—not the billing physicians—exercised general supervision over the nuclear stress tests. For example, there's evidence that Digirad employees, including Dr. Iskandrian, approved the daily MPI-TC schedule, ordered the radioisotopes, determined the radioisotope dosage, performed the MPI-TC by injecting the patients with the radioisotopes, and had "total control of the designated space with respect to radiation safety, including the training and supervision of Digirad and Clinical Facility staff." (Docs. 120-6 at 9, 131-6, Doc. 126-13 at 12). So there's a fact question about who exercised overall direction and control over the nuclear stress tests.

16

## B. Radioactive Materials License (RMLs)

This point is a bit more nuanced, so the court starts by laying out both sides' arguments in detail.

1. <u>Livingston's allegation</u>: Under the Digirad business model, billing physicians do not have to have their own RMLs; they rely on Digirad's RML. Livingston asserts that because APC and SKHC did not have their own RMLs, the physicians at APC and SKHC were not authorized to "receive, acquire, possess, use, transfer or dispose of" the radioactive isotopes for which they billed Medicare, (doc. 43 at 22), which in turn means that the billing physicians couldn't perform the stress tests.

As the RML holder, Digirad performed them instead. According to Livingston, under an RML issued by the Alabama Department of Health, only authorized users (or those under the supervision of an authorized user) can order or use radioisotopes. During the relevant time, Dr. Ami Iskandrian was listed as an authorized user on Digirad's RML. Though not otherwise affiliated with APC or SKHC, Dr. Iskandrian was the authorized user in charge of the radioactive materials used during the stress tests at APC and SKHC. Dr. Iskandrian authorized Digirad employees to order and procure radioisotopes, determined the proper dosage of the radioisotopes, authorized Digirad employees to administer radioisotopes to patients at APC and SKHC, and remained available via telephone to answer questions or provide input as needed. (Doc. 132 at 33). Thus, Livingston asserts that Dr. Iskandrian—not the APC/SKHC physicians—exercised general supervision over the nuclear stress tests conducted at APC and SKHC and was the only physician who could lawfully bill CMS for supervising the technical component of those nuclear stress tests. (*Id.* at 35–36). So, Livingston alleges, APC and SKHC physicians submitted false claims for reimbursement because they did not train the non-physician personnel, maintain the necessary equipment, or provide the required general supervision over the radioisotopes used during the nuclear stress tests performed in their offices. (*Id.* at 36).

2. <u>Digirad's argument</u>: Digirad argues that Alabama law does not require customers of mobile medical services to obtain their own RMLs if the mobile medical service has an RML. *See* Ala. Admin. Code 420-3-26-.07(9)(a). According to Digirad, the Alabama regulations just require the mobile medical service to obtain a written authorization from the billing physician, authorizing it to use radioactive materials at the customer's locations. Digirad asserts that by signing the MOU allowing APC and SKHC to use Digirad's RML (doc. 43-2 at 2), Digirad, APC, and SKHC all acted within the law. *See* Ala. Admin. Code 420-3-26-.07(9)(b); 10 C.F.R. § 35.80(a)(l). Digirad thus argues that it complied with Alabama regulations when its technicians administered the radioisotopes under the overall direction and control of the APC/SKHC supervising physicians. (Doc. 123 at 45).

Digirad also argues that no statutory or regulatory authority supports Livingston's position that because a physician is not listed on an entity's RML, the physician is automatically disqualified from providing "overall direction and control" over the technical component of a nuclear stress test. (Doc. 139 at 15–16). Digirad argues that Livingston does not rely on a regulation or statute to support his allegation (because there is not one), so he instead improperly relies on a "hyper-technical amalgamation of CMS, IAC, and Alabama standards." (*Id.* at 16–17). Digirad states that Medicare does not require that the billing physician also be an authorized user on the RML to exercise overall direction and control over nuclear stress tests.

Lastly, Digirad asserts that all billing physicians must to do to properly exercise general supervision over nuclear stress tests is order the procedure, assemble the appropriate team, and remain responsible for the outcome. (*Id.* at 17). And Digirad asserts that the billing physicians at APC and SKHC did just that. (*Id.* at 18).

3. <u>Analysis</u>: Digirad is right that Livingston hasn't pointed to any Medicare regulation or Alabama law that says only the authorized user on the RML can exercise overall direction and control over nuclear stress tests. But that's not enough to grant summary judgment. A reasonable juror could find that Dr. Iskandrian's role as the authorized user and his amount of involvement in the nuclear stress tests at APC and SKHC supports Livingston's argument that the billing physicians weren't the ones who controlled how the nuclear stress tests were run. As Digirad admits, Dr. Iskandrian was the person required to release the radiopharmaceuticals and to set the radioisotope dosage. And Digirad's MOU states that: (1) only the RML holder can order, receive delivery of, and dispose of radiopharmaceuticals; (2) the RML holder "has total control of the designated space with respect to radiation safety, including the training and supervision of Digirad and Clinical Facility staff, control and handling of radioactive materials, and responsibility for compliance with the Rules and the RML holder's policies and procedures"; and (3) the RML holder would provide periodic training on the Rules and the RML holder's policies and procedures. (Doc. 128-13 at 12). A reasonable juror viewing this evidence in the light most favorable to Livingston could find that the RML holder alone exercised overall direction and control over the technical component of the nuclear stress tests. And if the jury finds that Dr. Iskandrian directed and controlled the stress tests, without direction, control, or supervision from the billing physicians, then Livingston could prevail on his claims.

## C. Objective Falsity

Digirad next asserts that it isn't liable under the FCA because APC and SKHC's claims were not objectively false. To establish falsity, Relators "must show an objective falsity." *United States v. AseraCare, Inc.*, 938 F.3d 1278, 1297-98 n.11 (11th Cir. 2019). And "the mere difference of reasonable opinions between physicians, without more, . . . does not constitute an objective falsehood." *Id.* at 1301 (footnote omitted). So in *AseraCare*, the Eleventh Circuit held that plaintiffs alleging that a

defendant falsely certified patients for hospice care "must identify facts and circumstances surrounding the patient's certification that are inconsistent with the proper exercise of a physician's clinical judgment" to prove falsity. *Id.* at 1297.

Digirad argues that this case is like *AseraCare* because Livingston hasn't identified an objective falsity because his claims depend on whether the billing physicians reasonably believed that they were qualified to and had supervised the procedures that they billed for. The court disagrees. As the Eleventh Circuit noted in *AseraCare*, the key hospice eligibility criterion of terminally ill "presents, by design, a question of debatable clinical judgment that may not, in all circumstances, lend itself to just one determination as to the proper exercise of that judgment." *Id.* at 1299. And "[a] properly formed and sincerely held clinical judgment is not untrue even if a different physician later contends that the judgment is wrong." *Id.* at 1298. So it's inappropriate to allow a jury to second guess a reasonable opinion that a patient is terminally ill. *Id.* at 1299.

In contrast, if the regulation at issue is "subject to multiple interpretations . . . yet ultimately only one of the two possible interpretations could be deemed correct," a jury question on falsity can exist. *Id.* For example, in *Walker*, the Eleventh Circuit found unclear what criteria must be fulfilled for doctor's offices to bill the services of nurse practitioners or physicians' assistants as services "incident to the service of a physician." *Walker*, 433 F.3d at 1356–57. Even so, the Eleventh Circuit held that evidence "that the Medicare regulation required that a physician be physically present in the office suite and otherwise more involved in a patient's course of care than the [defendant's] physicians were and that [defendant] knew of these requirements" created a jury question on falsity. *Id.* at 1358. The facts here are more like those in *Walker* than in *AseraCare*. Either the billing physicians exercised general supervision over the nuclear stress tests or they didn't. And Livingston has presented enough evidence to allow a reasonable juror to find that the billing physicians weren't as involved in the nuclear stress tests as

necessary to bill for the procedure. So Livingston has presented a question of objective falsity that could support liability under the FCA.

### D. Medical Director Designation

Medicare requires medical providers who seek reimbursement for nuclear stress tests to be accredited through a designated accrediting organization. *See* 42 U.S.C. § 1395m; 42 U.S.C. § 1395y. Digirad uses IAC as its preferred accrediting organization. IAC standards require that the "Medical Director" be a licensed physician and an authorized user of radioisotopes. According to Livingston, Digirad designated Dr. Iskandrian to be the Medical Director for APC and SKHC. Livingston asserts that as the Medical Director in charge of quality control, radiation safety, and the quality and appropriateness of care, Dr. Iskandrian—not the APC or SKHC physicians—exercised general supervision over the nuclear stress tests conducted at APC and SKHC. (Doc. 132 at 38). Thus, Livingston argues that because the APC and SKHC physicians did not exercise general supervision over the nuclear stress tests that Digirad employees conducted in their offices, the physicians could not properly bill Medicare for these procedures. (*Id.* at 39).

Digirad counters that IAC rules expressly allow the Medical Director to delegate radiation safety and quality to a non-physician radiation safety officer and that IAC rules require nothing other than that a licensed physician supervise the technical component. (Doc. 139 at 19 (citing doc. 131-9 at 155)). As Digirad's expert explains, the Medical Director "exercise[s] general oversight by ensuring that policies and procedures are in place and periodically reviewed." (Doc. 118-9 at 8). And the Medical Director "ensures that radiation safety protocols are established and followed." (*Id.*).

That may be true, but a reasonable juror could agree that Dr. Iskandrian served as the Medical Director for the APC and SKHC nuclear stress tests and was therefore the supervising physician for those tests— not the billing physicians. So summary judgment is not due.

### E. False Records or Statements

The FCA imposes liability on any person who "knowingly makes, uses or causes to be made or used, a false record or statement material to a false or fraudulent claim." 31 U.S.C. § 3729(a)(1)(B). Under this FCA subsection, a relator must show that: (1) the defendant made (or caused to be made) a false statement; (2) the defendant knew it to be false; and (3) the statement was material to a false claim. *United States ex rel. Phalp v. Lincare Holdings, Inc.*, 857 F.3d 1148, 1154 (11th Cir. 2017). In Count II, Livingston claimed that Digirad caused false records to be made that are material to a false claim, including invoices, billing slips, and email instructions to inform APC and SKHC physician offices of what services to bill to Medicare. (Doc. 132 at 39; doc. 43 at 55–56).

Digirad asserts that the record must contain patently fraudulent information to be considered false. *See United States ex rel. Bane v. Breathe Easy Pulmonary Servs., Inc.*, 597 F. Supp. 2d 1280, 1293 (M.D. Fla. 2009). Digirad argues that there was nothing false or misleading about the records Digirad allegedly created because even if they exist, the records simply reflect what services the physicians ordered and what services Digirad employees performed; they do not make any representation about supervision services. (Doc. 123 at 45). Digirad also asserts that these records—when analyzed along with the Service Contracts—are still not false because the Service Contracts do not make any representations that the physicians are qualified to supervise under federal law or that the arrangement complies with Medicare rules, regulations, and requirements.

In response to Digirad's arguments, Livingston clarifies that he contends that the false records Digirad made under § 3729(a)(1)(B) include invoices, billing slips, and email instructions informing the billing physicians of what to bill Medicare. Livingston then specifically points to an email back and forth between the office manager for SKHC and Digirad's Regional Business Manager about which CPT codes to use when billing stress tests. According to Livingston, that Digirad emailed SKHC

to bill CPT code 78452, which corresponds with the technical component of a nuclear stress test, and SKHC later billed Medicare under code 78452 shows that Digirad made a false record material to a false claim.

The court agrees with Digirad that Livingston fails to show that Digirad made a false statement or record material to a false claim. Though Livingston says that Digirad's invoices and billing slips include false statements, he doesn't cite the billing slips and invoices he's referring to. Nor does he describe the statements within these documents or explain how those statements are false. And the email response that Livingston cites simply states, "Nuclear CPT codes for Medicare, Medicare Adv, or UHC payers: 78452 + 93016 + 93017 + A9500 + A9505 (it will always be the four codes on a full complet[e] stress test)." (Doc. 132 at 40). This statement is factually correct—those are the four CPT codes a physician should bill Medicare when he oversees a nuclear stress test. So while this email may support Livingston's Count I claim that Digirad ***caused*** the billing physicians to submit false claims, it doesn't show that Digirad ***made*** a false statement or record, which is what Count II requires. Because Livingston offers no evidence that Digirad made or used a false statement or record, the court will grant summary judgment on Count II.

* * *

To sum up, the court will dismiss Count II because Livingston provides no evidence that Digirad made a false statement or record material to the allegedly false claims submitted by the billing physicians. But a jury could find that the billing physicians submitted false claims to Medicare because they didn't exercise the necessary supervision over the technical component of the nuclear stress tests. So the court must next decide whether a jury could find that Digirad caused the billing physicians to submit the allegedly false claims.

### III.   Causation

#### A. Submission of False Claims

Under Eleventh Circuit precedent, a "defendant's conduct may be found to have caused the submission of a claim for Medicare reimbursement if the conduct was (1) a substantial factor in inducing providers to submit claims for reimbursement, and (2) if the submission of claims for reimbursement was reasonably foreseeable or anticipated as a natural consequence of defendants' conduct." *Ruckh v. Salus Rehab., LLC*, 963 F.3d 1089, 1107 (11th Cir. 2020) (quoting *United States v. Marder*, 208 F. Supp. 3d 1296, 1312–13 (S.D. Fla. 2016)). Livingston claims that Digirad knowingly concocted a scheme to perform/supervise services, then have the billing physicians bill Medicare for Digirad's services as if the billing physicians had rendered those services. (Doc. 132 at 46–47). Livingston also claims that Digirad "caused to be presented" the billing physicians' false claims by instructing, encouraging, and assisting the billing physicians to submit claims Digirad knew to be false to Medicare for reimbursement. (Doc. 43 at 53–54).

Digirad counters that it neither pressured the physicians at APC or SKHC to submit false claims nor concealed the nature of its business model from them. (Doc. 123 at 49). Digirad also asserts that APC and SKHC had independent professional obligations to evaluate the arrangements and confirm whether the proposed arrangements complied with Medicare billing rules. (*Id.*). *See* RESTATEMENT (SECOND) OF TORTS § 547 (1977) (Oct. 2021 update) ("[T]he maker of a fraudulent misrepresentation is not liable to another whose decision to engage in the transaction that the representation was intended to induce is not caused by his belief in the truth of the representation but is the result of an independent investigation made by him.").

The court has reviewed evidence of Digirad's business model, the role Digirad employees played in the nuclear stress tests, Digirad's MOU, the phone calls between Livingston and the billing physicians' offices, and

the other evidence referenced in the parties' submissions. Viewing this evidence in the light most favorable to Livingston, a reasonable juror could find that Digirad's conduct was "(1) a substantial factor in inducing providers to submit claims for reimbursement, and that (2) the submission of claims for reimbursement was reasonably foreseeable or anticipated as a natural consequence of [Digirad's] conduct." *Ruckh*, 963 F.3d at 1108 (internal quotations omitted). So the court denies summary judgment on causation.

## IV.   Link Between Remuneration and Submitted Claims

In Counts III and IV, Livingston alleges FCA liability based on Anti-Kickback Statute ("AKS") and Stark Law violations. For these counts Livingston must prove causation, or some "link," between the payment of remuneration and the submission of false claims. *See United States ex rel King v. Solvay Pharmaceuticals, Inc.*, 871 F.3d 318, 331–32 (5th Cir. 2017) (affirming summary judgment for the defendant because the Relator could not show "that such compensation, or any incidental benefits, caused . . . physicians to prescribe" the medication and "it would be speculation to infer that compensation for professional services legally rendered actually caused the physicians to prescribe [defendant's] drugs to Medicaid patients.").

Digirad argues that Livingston cannot succeed on his claims that Digirad caused the submission of claims in violation of the AKS or Stark Law because Livingston presented no evidence that the alleged payment caused the billing physicians to order nuclear stress tests. (Doc. 123 at 52). Digirad asserts that the evidence shows the opposite; that the billing physicians only ordered medically necessary services and that one of the two practices cancelled the contract because it was not viable for their patient population. (*Id.* at 53).

Under Livingston's theory, the illegal remuneration is the billing physicians' ability to bill Medicare for services that Digirad performed, which Livingston says results in a windfall to the billing physicians. (Doc.

25

43 ¶ 114). According to Livingston, Digirad assists the billing physicians with receiving this reimbursement from Medicare by providing the billing physicians with patient service logs (doc. 118-9 at 28–80) and instructions on how to bill for the nuclear stress tests. Given Livingston's allegation that the alleged kickback comes directly from the Medicare payments, the court finds that whether promise of this payment is what caused the billing physicians to bill Medicare for the nuclear stress tests is a disputed fact question for the jury to decide.

## V.    Scienter: Knowledge of Falsity

It's not enough for Livingston to prove that Digirad caused the billing physicians to submit a false claim. He must also prove that Digirad knowingly did so—*i.e.*, that Digirad acted with actual knowledge, deliberate ignorance, or reckless disregard of the truth or falsity of the claim. 31 U.S.C. § 3729(a)(1)(A). The FCA's scienter requirement is rigorous, and "liability does not attach to innocent mistakes or simple negligence." *Escobar*, 579 U.S. at 192. The Eleventh Circuit has held, that even under the reckless disregard standard, "[l]iability attaches to [o]nly those who act in gross negligence – those who fail to make such inquiry as would be reasonable and prudent to conduct under the circumstances." *Urquilla-Diaz v. Kaplan Univ.*, 780 F.3d 1039, 1058 (11th Cir. 2015) (quoting S. REP. 99- 345, 20, 1986 U.S.C.C.A.N. 5266, 5285). An "objectively reasonable interpretation of the rules" is a defense that "negates the scienter element" – "even if [the party's] interpretation is incorrect[.]" *Olhausen v. Arriva Med., LLC*, No. 21-10366, 2022 WL 1203023, at *2 (11th Cir. Apr. 22, 2022).

Livingston claims that Digirad knowingly concocted the scheme to induce APC and SKHC to submit false claims to the government. (Doc. 132 at 49). But Digirad argues that Livingston presented no evidence that Digirad or the billing physicians were aware of, or agreed with, Livingston's theory that a physician cannot supervise the technical component of a nuclear stress test without being listed as an authorized user on an entity's RML. (Doc. 139 at 20). Digirad also argues that it was

26

reasonable for Digirad and the billing physicians to believe that the billing physicians could supervise the technical component of a nuclear stress test without being listed as an authorized user on an entity's RML. (*Id.* at 21). In response, Livingston asserts that it is standard that the person billing Medicare for services rendered must have completed the work, so Digirad's assertion that it lacked knowledge is a question for the jury.

The court agrees with Livingston that a reasonable juror could find that Digirad acted with the required scienter when it created and executed its business model. Again, the main question here isn't whether the billing physicians were qualified to supervise the nuclear stress tests or if the RML's authorized user is the only one who could exercise general supervision over the tests. The question is whether the billing physicians maintained overall direction and control over the technical component of the nuclear stress tests. And viewing the evidence in the light most favorable to Livingston, the billing physicians had little to no involvement in how the nuclear stress tests were run. It would be objectively unreasonable for Digirad to interpret the general supervision requirement as allowing the billing physicians to bill for services that they didn't conduct, control, or supervise. So the court won't grant summary judgment on scienter grounds.

## VI.    Anti-Kickback or Stark Law Intent Requirement

1. <u>Anti-Kickback</u>: A person violates the AKS by "knowingly or willfully" soliciting or receiving payment. 42 U.S.C. § 1320a-7b. To prove an FCA violation based on the AKS, Livingston must prove that Digirad "made kickbacks with the intent of inducing referrals, and [d]efendants knowingly paid remuneration in exchange for referrals." *United States ex rel. Carmen Medrano v. Diabetic Care RX, LLC*, 2018 WL 6978633, at *2 (S.D. Fla. Nov. 30, 2018) (citations omitted).

Livingston argues that Digirad violated the AKS in two ways: (1) Digirad charged a discounted rate for each patient at APC and SKHC after the first four patients on a service day; and (2) Digirad offered,

enticed, and promoted APC and SKHC physicians to bill Medicare for services that Digirad's Medical Director provided. (Doc. 132 at 50–51). Digirad asserts that Livingston cites no evidence that Digirad acted with the specific intent to violate the AKS or with the requisite intent to violate the FCA through kickbacks. To support its argument, Digirad points to deposition testimony from Digirad employees stating that they did not think the purpose of the payment schedule was to induce referrals or provide a discount. (Doc. 120-12, 97:20–101:4; doc. 120-13, 122:1–14, 140:12–18). The court finds that there is a fact question about whether Digirad acted with the requisite intent. A reasonable juror viewing the evidence in the light most favorable to Livingston could find that Digirad intentionally enticed the billing physicians to refer patients to Digirad by encouraging the billing physicians to bill for services provided by Digirad.

2. <u>Stark Law</u>: The Stark Law is a strict liability statute, but when it serves as a predicate for an FCA violation, the Relator must prove that the Defendant knowingly violated the FCA because of an alleged Stark violation. *See United States ex rel. Drakeford v. Tuomey*, 792 F.3d 364, 376 (4th Cir. 2015). Digirad asserts that it didn't act with the requisite intent to violate the Stark Law because it reasonably interpreted the "In-Office Ancillary Services" exception to Stark to allow Digirad's business arrangements with APC and SKHC. Under this exception, Stark's referral prohibition does not apply when the services at issue are furnished by the referring physician or "[a]n individual who is supervised by the referring physician . . . provided that the supervision complies with all other applicable Medicare payment and coverage rules for the services." 42 C.F.R. § 411.355.

Whether Digirad's interpretation of the In-Office Ancillary Services exception negates its alleged scienter depends on how you view the facts. Viewing the evidence in the light most favorable to Livingston, the billing physicians didn't supervise the Digirad employees who performed the technical component of the nuclear stress test. Or at least, the billing physicians didn't provide the level of general supervision that the

Medicare rules require. So under Livingston's version of the facts—the version the court must assume is true—it would be unreasonable for Digirad to think that it had complied with the Stark Law. As a result, the court denies summary judgment on Counts III–IV, as much as Digirad argues that Livingston cannot prove scienter.

## VII.   Materiality

Digirad argues that even if Livingston has presented evidence that Digirad knew the billing physicians' Medicare claims were false, he hasn't shown that the falsity was material—*i.e.* that the Government would have refused to pay the claims if the Government knew that the physicians had not supervised the tests or otherwise violated federal law.

The Supreme Court has said, "[a] misrepresentation about compliance with a statutory, regulatory, or contractual requirement must be material to the Government's payment decision in order to be actionable under the False Claims Act." *Escobar*, 579 U.S. at 181. And the FCA defines material as "having a natural tendency to influence, or be capable of influencing, the payment or receipt of money or property." 31 U.S.C. § 3729(b)(4). The Supreme Court has said that the "materiality standard is demanding"; it is not met simply because "the Government would be entitled to refuse payment were it aware of [a statutory, regulatory, or contractual] violation." *Escobar*, 579 U.S. at 194–95. Nor is minor or insubstantial noncompliance material. *See id.* at 194.

No single factor is dispositive for materiality; relevant factors include whether the requirement is a condition of the government's payment, whether the misrepresentations went to the essence of the bargain with the government, and, as much as the government had knowledge of the misrepresentations, the effect on the government's behavior. *United States ex rel. Bibby v. Mortg. Inv'rs Corp.*, 987 F.3d 1340, 1347–51 (11th Cir. 2021).

1. <u>Waiver</u>: As explained, Count I presents two theories of FCA liability. One theory is that Digirad caused the billing physicians to submit false claims for services the billing physicians didn't provide or supervise. The other theory is that Digirad caused the billing physicians to falsely imply compliance with Medicare laws and regulations. In its motion for summary judgment, Digirad only raises materiality as to the implied false certification theory. (Doc. 123 at 61–62).

Livingston argues that by not raising materiality as to Livingston's other claims/theory, Digirad has waived this argument on those other claims. *See APA Excelsior III L.P. v. Premiere Technologies, Inc.*, 476 F.3d 1261, 1269 (11th Cir. 2007). In its reply, Digirad asserts that the theories for falsity and implied false certification are the same and that Livingston cited no authority that Digirad's argument would not apply to Livingston's entire claim. (Doc. 139 at 23). But it does not matter if a party's argument could apply to another claim; the burden is on the party moving for summary judgment to properly argue for summary judgment. The court finds that Digirad waived its materiality argument on claims not based on the implied false certification theory. And even if Digirad had not waived its argument, it would fail for the same reasons detailed below.

2. <u>Merits</u>: According to Digirad, Livingston's implied false certification claim fails each of the three materiality factors. Though Livingston's response to Digirad's arguments is lacking and only really addresses the first factor, the court ultimately finds that it's up to a jury to weigh these factors and determine materiality.

a. <u>Condition of payment</u>: First, Digirad asserts that Livingston's interpretation that only a "qualified" physician—a cardiologist listed on a business's RML—can supervise the technical component of a nuclear stress test is not a condition of payment because 42 C.F.R. § 410.32 only requires general supervision by a physician. *See United States ex rel Hobbs v. MedQuest Associates, Inc.*, 711 F.3d 707, 715 (6th Cir. 2013). Digirad argues that because the Medicare regulation only requires supervision by a physician and does not include heightened qualifications,

a state regulatory requirement like Alabama's "Authorized User" regulation cannot be material. *See United States ex rel. O'Laughlin v. Radiation Therapy*, 497 F. Supp. 3d 224, 233 (E.D.K.Y. 2020).

But this argument again ignores the crux of Livingston's claim: the billing physicians had to exercise general supervision; they failed to do so; yet they billed for the tests anyway. Digirad doesn't dispute that the physician's exercise of general supervision over the technical component of the nuclear stress test is a requirement of the applicable regulation. And, as Livingston points out, the CMS 1500 required the billing physicians to certify that their claims for payment complied with all applicable Medicare and Medicaid laws and regulations. The government's decision to identify compliance with Medicare's requirements as a condition of payment is "relevant, but not automatically dispositive" of the materiality inquiry. *See Escobar*, 579 U.S. at 194. So the court considers whether a jury could determine that the other factors support a finding of materiality.[3]

b. <u>Benefit of the bargain</u>: Second, Digirad argues that Medicare received the benefit of the bargain because even if Medicare requires that a cardiologist listed on an RML be the physician to supervise the technical component of the nuclear stress tests APC and SKHC billed for, Dr. Iskandrian—a licensed cardiologist listed as an authorized user on Digirad's RML—satisfied that condition. *See O'Laughlin,* 497 F. Supp. 3d at 237–39 (holding that billing under the wrong physician's name and NPI number, though incorrect, was not material to payment because the procedure was still properly supervised by a physician). That's one way to look at it. But it's not the only way. That Medicare allows only the physician exercising general supervision over the nuclear stress test to bill for the technical component of the test suggests that Medicare cares

---

[3] Livingston spends much of his response brief discussing how AKS violations are material to claims seeking Medicare reimbursement. But as Digirad points out in its reply brief, Digirad hasn't argued that the alleged AKS violations wouldn't be material.

about who that person is and that the person be the one to receive the reimbursement from Medicare. It's up to the jury to pick between the two.

      c. <u>Government's knowledge</u>: Third, Digirad argues that because IAC provides weekly reports to Medicare with lists of all accredited providers and their NPI numbers, the government knew that the APC and SKHC physicians were not cardiologists or radiologists and approved them to bill anyway. (Doc. 123 at 65). While this evidence suggests that Medicare may have known that the billing physicians weren't authorized users on Digirad's RML license, it doesn't show that the government knew that the billing physicians weren't exercising overall direction and control over the technical component of the nuclear stress tests. So while relevant, this evidence doesn't compel the conclusion that the government kept paying claims despite knowing that the physicians were violating the general supervision requirement. It thus fails to provide strong evidence that the materiality requirement isn't satisfied. *See Escobar*, 579 U.S. at 194–95 (explaining that there's strong evidence that requirements aren't material when "the Government regularly pays a particular type of claim in full despite actual knowledge that [the] requirements were violated").

*\* \* \**

      The court finds that there are good arguments for and against the materiality requirement being satisfied. And it's the jury's duty to weigh the materiality factors against each other. *See Bibby*, 987 F.3d at 1352. So the court denies summary judgment on materiality grounds.

## VIII. Presentment/Payment

"Liability under the False Claims Act arises from the submission of a fraudulent claim to the government, not the disregard of government regulations or failure to maintain proper internal policies." *Corsello v. Lincare, Inc.*, 428 F.3d 1008, 1012 (11th Cir. 2005). Digirad argues that it isn't liable because Livingston provides no evidence that Medicare received or paid the allegedly false claims.[4] As Digirad points out, SKHC produced 690 pages of documents, but none shows that Medicare received a claim for the technical component of a nuclear stress test from an SKHC physician or that an SKHC physician received payment from Medicare for the technical component of a nuclear stress test. And APC physician Dr. Edwards affirmed under oath that his practice "never received reimbursement from Medicare for nuclear stress testing performed in [his] office." (Doc. 120-1 ¶ 24).

But Dr. Edwards also affirmed that APC "submitted claims in accordance with Medicare billing procedures." (Doc. 120-1 ¶ 22). And Dr. Subhir Paul affirmed that SKHC "was and is familiar with Medicare's billing rules and requirements . . . and would not have submitted any bill to Medicare if we believed it to be illegal or improper." (Doc. 120-2 ¶ 30). A reasonable juror viewing this testimony in a light most favorable to Livingston could find that APC and SKHC submitted claims to Medicare. So the court cannot grant summary judgment on presentment grounds.

That said, Livingston must provide competent evidence at trial that APC and SKHC submitted false claims and received a certain amount of Medicare funds for those claims to prove damages. Plus, Livingston must prove the number of false claims APC and SKHC submitted if Livingston seeks penalties.

---

[4] Digirad makes distinct arguments for Livingston's "Make or Use" claims under Count II. The court does not address those arguments because the court granted summary judgment on Count II because Livingston presented no evidence that Digirad created a false statement or record material to the billing physician's claims for payment. *See supra* Part II(E).

## IX.    Remuneration

In Counts III and IV, Livingston alleges that Digirad violated the FCA by causing the billing physicians to present false or fraudulent claims based on violations of the AKS (Count III), 42 U.S.C. § 1320a-7(b), and Stark Law (Count IV), 42 U.S.C. § 1395nn. Livingston argues that Digirad violated these statutes by creating an illegal referral payment scheme in which the billing physicians obtained windfall profits—*i.e.*, the margin between Digirad's fee and the amount that Medicare paid the billing physicians for Digirad's services. (Doc. 43 at 57).

Digirad argues that these claims fail for four reasons.

First, Digirad argues that Livingston's allegation of "windfall profits" is legally and factually misplaced. (Doc. 123 at 68–69). Digirad asserts that Livingston's allegation is *legally* misplaced because the Medicare allowable is not the benchmark for measuring illegal remuneration. *See Klaczak v. Consolidated Med. Transp.*, 458 F. Supp. 2d 622, 679-80 (N.D. Ill. 2006) (rejecting the relator's allegation that a mobile ambulance company charging hospitals less than the Medicare allowable rate paid illegal "remuneration" because there was no showing that the Medicare allowable was, in fact, equivalent to fair market value.). Digirad asserts that Livingston's windfall-profits allegation is *factually* misplaced because the billing physicians contributed significant personal, administrative, and physical resources to the performance of the procedure beyond what they pay Digirad, including the physicians' presence and supervision, administrative staff, building overhead, and administrative services. Digirad asserts that once the billing physicians' contributions are factored in, the billing physicians only net around 2% profit from nuclear stress testing and take a loss if the equation is limited only to Medicare reimbursement. (*Id.* at 69).

Livingston counters that the billing physicians provided no services, which as the court has explained, presents a jury question.

Second, Digirad argues that there was no illegal payment because any benefit conferred was for fair market value. Under Eleventh Circuit precedent, "remuneration" means the "transfer[] of items or service[s] for free or for other than fair market value." *Bingham v. HCA, Inc.*, 783 F. App'x 868, 873 (11th Cir. 2019). Livingston has the burden to prove that a transaction was for other than fair market value, *id.* at 873, and Digirad argues that Livingston failed to meet this burden because (a) he did not present an expert and (b) there is no evidence that Digirad's services were offered below market value. In support, Digirad's expert, Mr. Barbo, concluded a cost-plus analysis and found that Digirad's rates were within the "reasonable fair market value range." (Doc. 120-10 at 3, 6).

Livingston argues that Digirad did not offer its services at fair market value and points to a discrepancy between the testimony of Digirad's corporate representative (Mr. Leftwich) and the testimony of Digirad's expert (Mr. Barbo) to assert that there is a genuine issue of material fact about whether Digirad's fees were at fair market value. Digirad argues that this comparison is misplaced because Mr. Leftwich discussed pricing and Mr. Barbo discussed costs. But if a reasonable juror viewed the evidence most favorably to Livingston, he could agree.

Third, Digirad asserts that any argument that it offered payment in the form of an "improper discount" if more than four patients were tested in any service day fails under the cost approach analysis. Digirad's expert concluded that the per-patient charge beyond the first four patients is not an improper discount because the fixed costs incurred in treating the first four patients are not incurred in treating additional patients. Livingston does not rely on the improper-discount theory, so this argument is irrelevant.

Fourth, Digirad argues that it is not liable under the Stark Law because its arrangement with the billing physicians falls within the exception for in-office ancillary services. 42 C.F.R. § 411.355(b) ("The prohibition on referral set forth in § 411.353 does not apply to . . . [i]n-office ancillary services.") Under this exception, in-office ancillary services are

services that are (1) "furnished personally" by the referring physician or "[a]n individual who is supervised by the referring physician . . . provided that the supervision complies with all other applicable Medicare [rules] . . . ," (2) furnished in the same building as the physician/group, and (3) billed by the physician/group. *Id.* Livingston did not directly respond to this argument. But as the court has explained, whether this exception applies hinges on a genuine dispute of material fact—whether the billing physicians supervised the nuclear stress tests.

In summary, Digirad argues that Livingston provides no evidence to support his allegation that Digirad's business model gave the billing physicians improper windfall profits or that Digirad's services were provided below market value. But the back and forth between Digirad and Livingston shows that each side's argument about remuneration has factual strengths and weaknesses. A reasonable juror viewing the evidence in the light most favorable to Livingston could find that Digirad offered the billing physicians payment in return for patient referrals. So the court denies summary judgment on the remuneration issue.

## X.   Conspiracy

In Count V, Livingston claims that Digirad conspired with the billing physicians to submit false claims. To prove an FCA conspiracy claim, Livingston must show: (1) an unlawful agreement between Digirad and the billing physician to get a false claim paid by the United States; and (2) "an act performed in furtherance of the conspiracy" by at least one of the conspirators. *Corsello v. Lincare, Inc.*, 428 F.3d 1008, 1014 (11th Cir. 2005).[5] Livingston must also show that the object of the agreement was to defraud the government—*i.e.*, the parties to the agreement acted with the specific intent to defraud the government. *See United States ex rel. Atkins v. McInteer*, 345 F. Supp. 2d 1302, 1304–05 (N.D. Ala. 2004).

---

[5] It is unclear whether the Relator must also allege that the United States suffered damages as a result of the agreement. *United States v. HPC Healthcare, Inc.,* 723 F. App'x 783, 791 (11th Cir. 2018).

Livingston alleges that Digirad conspired with the billing physicians by executing the Service Agreements, advertising "windfall profits," providing bill slips identifying the services, and instructing and causing the submission of false claims. (Doc. 43 at 60). Digirad argues: (1) that these allegations are pure conjecture; (2) that the Service Contracts are legitimate commercial agreements to provide services in exchange for a daily rate; (3) that there is no evidence that Digirad discussed windfall profits with its billing physicians; and (4) that Digirad's order forms were not false. In short, Digirad argues that Livingston failed to show that Digirad and the billing physicians agreed to defraud the government or that they had the specific intent to defraud the government.

In response, Livingston argues that there is substantial evidence of a conspiracy to violate the FCA. Livingston asserts that the patient service logs show the agreement and the intent. Digirad pre-certifies the patients to identify the patients' insurance companies and provides the billing physicians with patient service logs. Livingston says that these patient service logs reveal that Digirad does the work and then provides the billing physicians with the patient names and the associated billing codes. Livingston also asserts that the billing physicians rely on the patient service logs to bill the insurance companies, including Medicare. According to Livingston, emails from Digirad offering to assist the billing physicians with billing also supports his conspiracy claim.

Finally, Livingston argues that the MOUs are evidence of a conspiracy because Digirad and the billing physicians agreed to follow the Digirad model in contradiction to the plain language of the MOU, which he says makes clear that billing physicians cannot meet the legal requirements for general supervision. Digirad counters, arguing that a contract for what one believes to be a legal service does not show ill intent.

The court finds that conspiratorial intent is a question for the jury to decide. Among other things, there's evidence that (a) Digirad and the billing physicians knew that the billing physicians had to exercise general

supervision over the technical component of the nuclear stress tests to bill for this component, (b) Digirad staff exercised general supervision, and (c) Digirad encouraged (or at least assisted) the billing physicians in billing Medicare for the nuclear stress tests. So the court will deny summary judgment on the conspiracy count.

<u>**CONCLUSION**</u>

For the reasons explained above, the court will **DENY AS MOOT** Digirad's motion to strike. (Doc. 138). The court will **GRANT** Digirad's motion for summary judgment on Count II. (Doc. 118). The court will **DENY** Digirad's motion for summary judgment on Counts I, III, IV, and V. The parties should prepare to try those counts.

The court will enter a separate order that carries out this ruling.

**Done** on September 8, 2022.

**COREY L. MAZE**
UNITED STATES DISTRICT JUDGE